[No. S150518. Jan. 31, 2011.]

CALIFORNIA FARM BUREAU FEDERATION et al. Plaintiffs and Appellants, v.
STATE WATER RESOURCES CONTROL BOARD, Defendant and Respondent.

422

424

426

COUNSEL

Gibson Dunn & Crutcher, David A. Battaglia, William E. Thomson, Eileen M. Ahern, Kahn A. Scolnick; Nancy N. McDonough and Carl G. Borden for Plaintiff and Appellant California Farm Bureau Federation.

Somach Simmons & Dunn, Stuart L. Somach, Kristen T. Castaños, Robert B. Hoffman and Daniel Kelly for Plaintiffs and Appellants Northern California Water Association and Central Valley Project Water Association.

O'Laughlin & Paris, Tim O'Laughlin and William C. Paris for San Joaquin River Group Authority as Amicus Curiae on behalf of Plaintiffs and Appellants.

Jason E. Resnick for Western Growers Association, California Cattlemen's Association and California Grape and Tree Fruit League as Amici Curiae on behalf of Plaintiffs and Appellants.

Harold Griffith as Amicus Curiae on behalf of Plaintiffs and Appellants.

Downey Brand, Kevin M. O'Brien, Jennifer L. Harder and Joseph S. Schofield for Association of California Water Agencies, Regional Council of Rural Counties and Family Water Alliance as Amici Curiae on behalf of Plaintiffs and Appellants.

Erika Frank; Michele Pielsticker; Law Office of Anthony T. Caso and Anthony T. Caso for California Chamber of Commerce, Personal Insurance Federation of California, Association of California Insurance Companies, Wine Institute, Federation of Independent Business Legal Foundation and California Taxpayers' Association as Amici Curiae on behalf of Plaintiffs and Appellants.

Trevor Grimm, Jonathan M. Coupal and Timothy A. Bittle for Howard Jarvis Taxpayers Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Fulbright & Jaworski, Jeffrey B. Margulies; and Heidi K. McAuliffe for National Paint & Coatings Association, Inc., as Amicus Curiae on behalf of Plaintiffs and Appellants.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Amy J. Winn, Acting Assistant Attorney General, David S. Chaney and Paul Gifford, Assistant Attorneys General, Gordon Burns, Deputy Solicitor General, William L. Carter, Matthew J. Goldman and Molly K. Mosley, Deputy Attorneys General, for Defendant and Respondent.

David R. Owen; Rossmann and Moore, Antonio Rossman, Roger B. Moore; Hamilton Candee, Katherine S. Poole; and Joanne S. Spalding for The Planning and Conservation League, Natural Resources Defense Council and Sierra Club as Amici Curiae on behalf of Defendant and Respondent.

Diane F. Boyer-Vine, Robert A. Pratt and Marian M. Johnston for the California Legislature as Amicus Curiae on behalf of Defendant and Respondent.

428

**OPINION**

**CORRIGAN, J.**—The California Constitution provides that any act to increase taxes must be passed by a two-thirds vote of the Legislature.[1] On the other hand, statutes that create or raise regulatory fees need only the assent of a simple majority.[2] In 2003, the Legislature passed amendments to the Water Code[3] by a 53 percent majority. Current section 1525 was enacted as part of these amendments. The threshold issue here is whether section 1525, subdivision (a) imposes a tax or a fee. We hold that the amendments and section 1525 do not explicitly impose a tax and, therefore, are not facially unconstitutional. However, because the record is unclear as to whether the fees were reasonably apportioned in terms of the regulatory activity's costs and the fees assessed, we direct the Court of Appeal to remand the matter to the trial court to make these findings.

A second issue is whether the Water Code amendments, or their implementing regulations, violate the supremacy clause of the United States Constitution by overassessing the beneficial interests of those who hold contractual rights to delivery of water from the federally administered Central Valley Project (hereafter, the federal contractors). We conclude that the statutes are not facially unconstitutional. We further determine that the constitutionality of the implementing regulations depends on whether they fairly assess and apportion the federal contractors' beneficial interests. However, because of conflicting factual assertions and an unclear record concerning the extent and value of those interests, we also direct remand to the trial court for findings on this issue.

## I. FACTUAL AND PROCEDURAL BACKGROUND[4]

The State Water Resources Control Board (SWRCB or Board) is responsible for the "orderly and efficient administration of . . . water resources" and exercises "adjudicatory and regulatory functions of the state." (§ 174.) The water in California belongs to the people, but the right to *use* water may be acquired as provided by law. (§§ 102, 1201.) The SWRCB's Division of

---

[1] California Constitution, article XIII A, section 3, originally approved by initiative as Proposition 13, sometimes referred to as the "People's Initiative to Limit Property Taxation," on June 6, 1978.

[2] On November 2, 2010, the voters approved Proposition 26, which requires a two-thirds supermajority vote of the Legislature to pass certain fees. None of the parties have asserted that the law enacted by Proposition 26 applies to this case.

[3] Hereafter, undesignated statutory references are to the Water Code.

[4] The factual and procedural background is largely adopted from the Court of Appeal opinion.

Water Rights (Water Rights Division or Division)[5] administers the water rights program, but its authority is limited. The SWRCB regulates all appropriative water rights acquired since 1914. An appropriative right is the right to take water from a watercourse that does not run adjacent to a landowner's property. Since 1914, all appropriative rights have been acquired through a system of permits and licenses[6] that the SWRCB or its predecessor state entities have issued. Before 1914, appropriative rights were acquired under common law principles or earlier statutes. The Water Rights Division has no permitting or licensing authority over riparian[7] or pueblo[8] rights, or over appropriative rights acquired before 1914. The SWRCB does have authority to prevent illegal diversions and to prevent waste or unreasonable use of water, regardless of the basis under which the right is held. (§ 275.) Riparian, pueblo, and pre-1914 appropriative rights account for 38 percent of currently held water rights.

Rights regulated under SWRCB licenses and permits include about 40 percent of state water subject to water rights. The federal government holds the remaining 22 percent of water rights. The United States Bureau of Reclamation (Bureau of Reclamation or Bureau) holds the permits and licenses to, and operates, the Central Valley Project (CVP or Project). The

---

[5] The Division consists of three sections: permitting, licensing, and hearings and special projects. As noted by the Court of Appeal, "[t]he permitting section 'processes water right applications, petitions to change terms in water right permits and water right licenses. Groundwater recordations, [and] statements of water diversion and use, which are a recordation function [*sic*] . . . .' The licensing section enforces existing permits and licenses and handles work associated with licensing a permit. The hearings and special projects section assists the SWRCB with various types of administrative hearings, reviews environmental documents filed in support of water rights applications and petitions, assists with the implementation of the Bay-Delta Water Quality Control Plan, and certifies water quality . . . ." Although the SWRCB has other divisions in its organization, we are concerned only with the Water Rights Division.

[6] Anyone seeking to obtain an appropriative water right files an application with the SWRCB (§ 1225 et seq.), which issues a water right permit. (§ 1380 et seq.) Beneficial use of water perfected under this post-1914 statutory scheme is confirmed by a license issued by the SWRCB. (§§ 1605, 1610.) The license is, in effect, a title or deed to the water right and is recorded in the county in which the diversion takes place. (§ 1650.)

[7] Under the common law riparian doctrine, a person owning land bordering a stream has the right to reasonable and beneficial use of water on his or her land. (*People v. Shirokow* (1980) 26 Cal.3d 301, 307 [162 Cal.Rptr. 30, 605 P.2d 859] (*Shirokow*).) A riparian owner must share the right to use water with other riparian owners. (See *Harris v. Harrison* (1892) 93 Cal. 676, 681 [29 P. 325].)

[8] "The pueblo water right—a distinctive feature of California water law—is the paramount right of an American city as successor of a Spanish or Mexican pueblo (municipality) to the use of water naturally occurring within the old pueblo limits for the use of the inhabitants of the city." (Hutchins, The Cal. Law of Water Rights (1956) p. 256.)

Project diverts and stores water from numerous sources.[9] The Bureau contracts out the responsibility to control, distribute, and use water under the permits it holds. However, these federal contracts involve use of less than 6 percent of the water over which the Bureau holds rights. The remaining water is diverted and stored by the Bureau for hydroelectric, wildlife and other purposes.

Historically, the operation of the Water Rights Division was supported by the state's General Fund, with only 0.5 percent of costs covered by fees. In 2003, the Legislative Analyst recommended that the Division's operating costs be shifted from the General Fund and covered instead by user fees imposed on permit and license holders.[10] The SWRCB strongly opposed the recommendation. The SWRCB pointed out that its authority to impose fees did not extend to those holding water rights that were not based on its permits and licenses. While riparian, pueblo, and pre-1914 rights (collectively, RPP rights) are protected by conditions in new (post-1914) permits and through the Water Rights Division's enforcement of activity, the Division did not have authority to impose fees on those RPP rights holders. As noted, the RPP rights holders comprise 38 percent of water rights holders in California. The SWRCB argued that while permit and license holders should pay their share, proportional fees on them could not cover the total cost of the Division's operation. Additionally, as explained in greater detail below, the federal Bureau of Reclamation and Indian tribes resist paying fees, relying on the principle of sovereign immunity.

These difficulties notwithstanding, the Legislature adopted the Legislative Analyst's recommendation and passed Senate Bill No. 1049 (2003–2004 Reg. Sess.), repealing certain sections of the Water Code and enacting sections 1525 through 1560. Together, these statutes are designed to make the Water Rights Division entirely fee supported.

A. *The Fee Legislation*

We begin with a summary of the relevant statutes.

---

[9] "In 1933, primarily to control flooding in the Central Valley, the California Legislature approved the Central Valley Project (CVP), which is the nation's largest water reclamation project and California's largest water supplier. [Citation.] Originally a state project, the CVP was turned over to the federal Bureau of Reclamation, which operates the CVP under rights granted by the SWRCB." (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1154 [77 Cal.Rptr.3d 578, 184 P.3d 709], fn. omitted.) To achieve its purposes, "[t]he CVP operates 21 reservoirs, 11 power plants, and 500 miles of major canals and aqueducts." (*Id.* at p. 1154, fn. 1.)

[10] The proposal called for General Fund support for the first half of the 2003–2004 fiscal year with fee increases covering the second half of the year. Thereafter, total Water Rights Division operations would be fee supported.

*Section 1525*

 Section 1525 sets forth the parties and entities subject to the new fees.[11] Section 1525, subdivision (a) requires the SWRCB to adopt a schedule of *annual fees* to be paid by each permit or license holder. This group does not include riparian, pueblo, or pre-1914 rights holders. Subdivision (b) of section 1525 requires the SWRCB to establish the schedule for a *one-time*

---

[11] In relevant part, section 1525 provides:

"(a) Each person or entity who holds a permit or license to appropriate water, and each lessor of water leased under Chapter 1.5 (commencing with Section 1020) of Part 1, shall pay an annual fee according to a fee schedule established by the board.

"(b) Each person or entity who files any of the following shall pay a fee according to a fee schedule established by the board:

"(1) An application for a permit to appropriate water.

"(2) A registration of appropriation for a small domestic use or livestock stockpond.

"(3) A petition for an extension of time within which to begin construction, to complete construction, or to apply the water to full beneficial use under a permit.

"(4) A petition to change the point of diversion, place of use, or purpose of use, under a permit or license.

"(5) A petition to change the conditions of a permit or license, requested by the permittee or licensee, that is not otherwise subject to paragraph (3) or (4).

"(6) A petition to change the point of discharge, place of use, or purpose of use, of treated wastewater, requested pursuant to Section 1211.

"(7) An application for approval of a water lease agreement.

"(8) A request for release from priority pursuant to Section 10504.

"(9) An application for an assignment of a state-filed application pursuant to Section 10504.

"(c) The board shall set the fee schedule authorized by this section so that the total amount of fees collected pursuant to this section equals that amount necessary to recover costs incurred in connection with the issuance, administration, review, monitoring, and enforcement of permits, licenses, certificates, and registrations to appropriate water, water leases, and orders approving changes in point of discharge, place of use, or purpose of use of treated wastewater. The board may include, as recoverable costs, but is not limited to including, the costs incurred in reviewing applications, registrations, petitions and requests, prescribing terms of permits, licenses, registrations, and change orders, enforcing and evaluating compliance with permits, licenses, certificates, registrations, change orders, and water leases, inspection, monitoring, planning, modeling, reviewing documents prepared for the purpose of regulating the diversion and use of water, applying and enforcing the prohibition set forth in Section 1052 against the unauthorized diversion or use of water subject to this division, and the administrative costs incurred in connection with carrying out these actions.

"(d)(1) The board shall adopt the schedule of fees authorized under this section as emergency regulations in accordance with Section 1530. [¶] . . . [¶]

"(3) The board shall set the amount of total revenue collected each year through the fees authorized by this section at an amount equal to the revenue levels set forth in the annual Budget Act for this activity. The board shall review and revise the fees each fiscal year as necessary to conform with the revenue levels set forth in the annual Budget Act. If the board determines that the revenue collected during the preceding year was greater than, or less than, the revenue levels set forth in the annual Budget Act, the board may further adjust the annual fees to compensate for the over or under collection of revenue.

"(e) Annual fees imposed pursuant to this section for the 2003–04 fiscal year shall be assessed for the entire 2003–04 fiscal year."

*application fee* for permits to appropriate water, for approval of leases, and for petitions relating to those applications.

■ Section 1525, subdivision (c) provides that the SWRCB "shall set the fee schedule authorized by this section so that the total amount of fees collected pursuant to this section equals that amount necessary to recover costs" of the Division's activities. Subdivision (c) sets out "recoverable costs" in substantial detail but the costs recoverable are "not limited to" those activities identified. (§ 1525, subd. (c).) Subdivision (d)(3) similarly requires the SWRCB to "set the amount of total revenue collected each year through the fees authorized by this section at an amount equal to the revenue levels set forth in the annual Budget Act for this activity." (§ 1525, subd. (d)(3).)

In other words, the statute requires that the total budgeted cost of the Division's operations be recovered from the fees. The SWRCB is to review and revise the fees each year as necessary, to ensure they conform with the revenue levels set in the annual budget act (Budget Act). If the revenue collected during the preceding year is either greater or less than the revenue levels set forth in the Budget Act, the SWRCB may adjust the annual fees to compensate for the disparity. (§ 1525, subd. (d)(3).) The SWRCB is also authorized to adopt "emergency regulations" to implement the fee schedule. (§ 1525, subd. (d)(1).)

*Section 1537*

Section 1537 generally covers collection. While the Board sets the fees, the money is actually collected by the Board of Equalization (BOE). The BOE collects and refunds annual fees collected under the Fee Collection Procedures Law (Rev. & Tax. Code, § 55001 et seq.), part of the Revenue and Taxation Code, as limited by subdivision (b)(2) through (4) of section 1537. The BOE has no role in reviewing refund claims under section 1537 or the emergency regulations.

*Sections 1540 and 1560*

Section 1540 concerns the allocation of annual fees to federal contractors. Section 1560 sets out the options that may be pursued when the federal Bureau of Reclamation or an Indian tribe declines to pay a fee by relying on sovereign immunity.[12] As relevant here, the federal government and Indian tribes are the entities eligible to assert sovereign immunity.

---

[12] Section 1540 provides: "If the board determines that the person or entity on whom a fee or expense is imposed will not pay the fee or expense based on the fact that the fee payer has sovereign immunity under Section 1560, the board may allocate the fee or expense, or an appropriate portion of the fee or expense, to persons or entities who have contracts for the

*Sections 1550, 1551, and 1552*

Sections 1550 and 1551 establish the Water Rights Fund, into which the BOE must deposit fees collected on behalf of the SWRCB. The Water Rights Fund is separate from the General Fund. Money in the Water Rights Fund may be used only for purposes set out in section 1552, which includes SWRCB expenditures necessary to carry out the work of the Water Rights Division, BOE expenditures in connection with collecting the SWRCB fees, and the payment of refunds. (§ 1552.)

B. *The Emergency Regulations*

To implement section 1525's fee requirement, the SWRCB adopted California Code of Regulations, title 23, sections 1066 and 1073 (regulation 1066 and regulation 1073). These regulations set formulas to calculate annual fees for permit and license holders, and for the federal contractors. Fees for issuance, supervision, and modification of permits and licenses, i.e., the revenue-producing activities now required to cover the entire cost of the Division's operations, were to be paid by the permit and license holders regulated by the SWRCB. No money would come from the General Fund. The Court of Appeal explained the difficulty the SWRCB had in setting the fees: "First, the SWRCB had to raise $4.4 million immediately to cover the cost of the water rights program in the second half of the 2003–2004 fiscal year. Second, the funding source had to be 'relatively stable.' Third, because of time constraints, SWRCB had to rely on its existing data base in

---

delivery of water from the person or entity on whom the fee or expense was initially imposed. The allocation of the fee or expense to these contractors does not affect ownership of any permit, license, or other water right, and does not vest any equitable title in the contractors."

Section 1560 provides:

"(a) The fees and expenses established under this chapter and Part 3 (commencing with Section 2000) apply to the United States and to Indian tribes, to the extent authorized under federal or tribal law.

"(b) If the United States or an Indian tribe declines to pay a fee or expense, or the board determines that the United States or the Indian tribe is likely to decline to pay a fee or expense, the board may do any of the following:

"(1) Initiate appropriate action to collect the fee or expense, including any appropriate enforcement action for failure to pay the fee or expense, if the board determines that federal or tribal law authorizes collection of the fee or expense.

"(2) Allocate the fee or expense, or an appropriate portion of the fee or expense, in accordance with Section 1540. The board may make this allocation as part of the emergency regulations adopted pursuant to Section 1530.

"(3) Enter into a contractual arrangement that requires the United States or the Indian tribe to reimburse the board, in whole or in part, for the services furnished by the board, either directly or indirectly, in connection with the activity for which the fee or expense is imposed.

"(4) Refuse to process any application, registration, petition, request, or proof of claim for which the fee or expense is not paid, if the board determines that refusal would not be inconsistent with federal law or the public interest."

calculating the amount of fees to be assessed. Fourth, although it cost SWRCB between $17,000 and $20,000 to process an application to appropriate water, SWRCB expected people would not seek SWRCB services if the one-time service fees were too high. Fifth, because most persons and entities subject to the annual fee held permits or licenses for less than 10 acre-feet of water,[13] a minimum fee was necessary to cover the cost of sending out the fee bills. Sixth, SWRCB anticipated that 40 percent of the water right permit and license holders would refuse to pay annual fees. Seventh, the SWRCB did not have permitting authority over certain holders of water rights (specifically the holders of riparian, pueblo and pre-1914 appropriative rights) amounting to approximately 38 percent of the water diverted in the state."

## C. *Annual Fee Formula for Post-1914 Permit and License Holders*

Regulation 1066 applies to post-1914 permit and license holders. Regulation 1066, former subdivision (a)[14] set the minimum annual fee as the greater of $100, or $0.03 for each acre-foot based on the total annual amount of diversion authorized by the permit or license.

To determine the annual fees, the Board started with the $4.4 million budget amount and assumed it would be unable to collect 40 percent of billings from water rights holders who claimed sovereign immunity or who refused to pay their bills. It divided the $4.4 million mandated by the Legislature by 0.6 to account for the estimated 40 percent noncollection rate. This increased its targeted revenue to approximately $7 million.

## D. *Annual Fee Formula for Federal Contractors*

Regulation 1073, which implemented the provisions of Water Code sections 1540 and 1560, addressed rights held by the Bureau of Reclamation, but contracted out to federal contractors. Regulation 1073, subdivision (b)(2) applies a formula to calculate the annual fee imposed on those contractors "[i]f the [Bureau of Reclamation] declines or is likely to decline to pay the fee or expense . . . for the [Central Valley Project]." In general, regulation 1073 assesses annual fees against contractors based on a prorated portion of the total amount of annual fees associated with all Bureau permits and licenses, rather than the portion available under the terms of their contracts.

---

[13] An acre-foot is "[t]he volume of water, 43,560 cubic feet, that will cover an area of one acre to a depth of one foot." (American Heritage Dict. (2d college ed. 1982) p. 75.)

[14] Regulation 1066, former subdivision (a) provided: "A person who holds a water right permit or license shall pay an annual fee that is the greater of $100 or $0.03 per acre-foot based on the total annual amount of diversion authorized by the permit or license." (Reg. 1066, subd. (a), Register 2003, No. 52 (Dec. 23, 2003).)

## E. *Proceedings Below*

In January 2004, the BOE sent fee notices to the section 1525 permit and license holders and to the federal contractors. The Budget Act set a target of $4.4 million in fee revenue because the balance for the first half of 2003–2004 was paid from General Fund revenue. $7.4 million in water rights fees was collected for fiscal year 2003–2004. The imposition of water rights fees was challenged by several groups of plaintiffs representing various water rights holders.[15]

Plaintiffs sought declaratory and injunctive relief and a writ of mandate. They alleged that the statutory scheme adopted by the Legislature and the emergency regulations adopted to implement the scheme were unconstitutional both on their face and as applied. The trial court denied the writ of mandate, ruling that the money collected constituted valid regulatory fees, rather than taxes. It also rejected plaintiffs' other constitutional claims.

The Court of Appeal reversed in part, holding that section 1525 was constitutional on its face, but that "as applied" under the emergency regulations, it imposed illegal levies. It remanded the matter to the trial court with instructions that it "(1) stay further proceedings before the SWRCB and/or BOE until the SWRCB adopts new fee schedule formulas and a procedure for calculating refunds if any; (2) order the SWRCB to adopt valid fee schedule formulas within 180 days of the finality of this opinion; (3) order the SWRCB to determine the amount of annual fees improperly assessed under regulations 1066 and 1073 for the 2003–2004 fiscal year and establish a procedure for calculating refunds, if any, due within 180 days of the finality of this opinion; and (4) order the Board of Equalization, through the SWRCB, to refund any annual fees unlawfully collected to fee payers who filed timely petitions for reconsideration with the SWRCB . . . ."[16]

---

[15] Plaintiff California Farm Bureau Federation (Farm Bureau) asserts it is authorized to take judicial action to protect the rights of farm families that hold water rights subject to the fees imposed by Senate Bill No. 1049 (2003–2004 Reg. Sess.) and the emergency regulations. The individuals named in its complaint hold water rights and have been assessed the section 1525 fees.

Plaintiff Northern California Water Association represents over 70 agricultural water districts within the Sacramento River Basin, some of which hold water rights. Other members receive water under contracts with the Bureau of Reclamation, and others operate hydroelectric plants licensed or regulated by the Federal Energy Regulatory Commission.

Plaintiff Central Valley Water Project Association represents the interests of some 300 agricultural and municipal districts, agencies and communities within the Central and Santa Clara Valleys that have contracts for water from the CVP.

[16] The terms "payor" and "payer" are synonymous and are used variably in case law.

## II. DISCUSSION

A. *Standard of Review*

Whether section 1525 imposes a tax or a fee is a question of law decided upon an independent review of the record. (*Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 874 [64 Cal.Rptr.2d 447, 937 P.2d 1350] (*Sinclair Paint*).)

■ The plaintiff challenging a fee bears the burden of proof to establish a prima facie case showing that the fee is invalid. (See *Sea & Sage Audubon Society, Inc. v. Planning Com.* (1983) 34 Cal.3d 412, 421 [194 Cal.Rptr. 357, 668 P.2d 664]; *Sargent Fletcher, Inc. v. Able Corp.* (2003) 110 Cal.App.4th 1658, 1668 [3 Cal.Rptr.3d 279] (*Sargent Fletcher*).) In other words, the plaintiff bears the burden of proof[17] "with respect to all facts essential to its claim for relief." (*Home Builders Assn. of Tulare/Kings Counties, Inc. v. City of Lemoore* (2010) 185 Cal.App.4th 554, 562 [112 Cal.Rptr.3d 7]; see Evid. Code, § 500.) The plaintiff "must present evidence sufficient to establish in the mind of the trier of fact or the court a requisite degree of belief (commonly proof by a preponderance of the evidence). [Citations.] The burden of proof *does not shift* . . . it remains with the party who originally bears it." (*Sargent Fletcher, supra*, 110 Cal.App.4th at p. 1667, original italics.)

■ This burden of persuasion is different from the "burden of producing evidence" (see Evid. Code, § 110), which may shift between the parties.[18] "[T]he burden of producing evidence as to a particular fact rests on the party with the burden of proof as to that fact. [Citations.] If that party fails to produce sufficient evidence to make a prima facie case, it risks nonsuit or other unfavorable determination. [Citations.] But once that party produces evidence sufficient to make its prima facie case, the burden of producing evidence *shifts* to the other party to refute the prima facie case." (*Sargent Fletcher, supra*, 110 Cal.App.4th at pp. 1667–1668, original italics.)

■ Thus, once plaintiffs have made their prima facie case, the state bears the burden of production and must show " '(1) the estimated costs of the

---

[17] The terms "burden of proof" and "burden of persuasion" are synonymous. (1 Witkin, Cal. Evidence (4th ed. 2000) Burden of Proof and Presumptions, § 3, p. 157.)

[18] The "burden of producing evidence" has also been referred to as the "burden of production" and the "burden of going forward." (*Sargent Fletcher, supra*, 110 Cal.App.4th at p. 1667.)

service or regulatory activity, and (2) the basis for determining the manner in which the costs are apportioned, so that charges allocated to a payor bear a fair or reasonable relationship to the payor's burdens on or benefits from the regulatory activity.' " (*Sinclair Paint, supra*, 15 Cal.4th at p. 878; see *California Assn. of Prof. Scientists v. Department of Fish & Game* (2000) 79 Cal.App.4th 935, 945 [94 Cal.Rptr.2d 535] (*Prof. Scientists*).)

B. *Valid Fee or Invalid Tax?*

 *Facial challenge*

 Plaintiff Farm Bureau contends that section 1525's annual fee requirement is unconstitutional on its face because it imposes a tax, not a valid regulatory fee.[19] We reject this contention.

 ■ California Constitution, article XIII A, former section 3 required that "any changes in state taxes enacted for the purpose of increasing revenues" be approved by a two-thirds majority of the Legislature. Senate Bill No. 1049 (2003–2004 Reg. Sess.) passed the Legislature with only a 53 percent majority. Thus, if the amount charged under section 1525 is a tax, it is invalid. If it is a regulatory fee, it is not subject to the supermajority requirement.

 ■ We have recognized that " 'tax' has no fixed meaning, and that the distinction between taxes and fees is frequently 'blurred,' taking on different meanings in different contexts. [Citations.]" (*Sinclair Paint, supra*, 15 Cal.4th at p. 874.) Ordinarily taxes are imposed for revenue purposes and not "in return for a specific benefit conferred or privilege granted. [Citations.] Most taxes are compulsory rather than imposed in response to a voluntary decision to develop or to seek other government benefits or privileges. [Citations.] But compulsory fees may be deemed legitimate fees rather than taxes. [Citation.]" (*Ibid.*)

 In contrast, a fee may be charged by a government entity so long as it does not exceed the reasonable cost of providing services necessary to regulate the activity for which the fee is charged. A valid fee may not be imposed for unrelated revenue purposes. (*Sinclair Paint, supra*, 15 Cal.4th at p. 876; *Pennell v. City of San Jose* (1986) 42 Cal.3d 365, 375 [228 Cal.Rptr. 726, 721 P.2d 1111].)[20]

---

[19] Plaintiffs do not challenge the one-time fees set forth in section 1525, subdivision (b).

[20] This case does not involve a special assessment or a development fee, two types of fees that are routinely challenged under Proposition 13. (*Prof. Scientists, supra*, 79 Cal.App.4th at p. 944.)

■ The scope of a regulatory fee is somewhat flexible and is related to the overall purposes of the regulatory governmental action. " 'A regulatory fee may be imposed under the police power when the fee constitutes an amount necessary to carry out the purposes and provisions of the regulation.' [Citation.] 'Such costs . . . include all those incident to the issuance of the license or permit, investigation, inspection, administration, maintenance of a system of supervision and enforcement.' [Citation.] Regulatory fees are valid despite the absence of any perceived 'benefit' accruing to the fee payers. [Citation.] Legislators 'need only apply sound judgment and consider "probabilities according to the best honest viewpoint of informed officials" in determining the amount of the regulatory fee.' [Citation.]" (*Prof. Scientists, supra*, 79 Cal.App.4th at p. 945.) "Simply because a fee exceeds the reasonable cost of providing the service or regulatory activity for which it is charged does not transform it into a tax." (*Barratt American, Inc. v. City of Rancho Cucamonga* (2005) 37 Cal.4th 685, 700 [37 Cal.Rptr.3d 149, 124 P.3d 719].) A regulatory fee does not become a tax simply because the fee may be disproportionate to the service rendered to individual payors. (*Brydon v. East Bay Mun. Utility Dist.* (1994) 24 Cal.App.4th 178, 194 [29 Cal.Rptr.2d 128].) The question of proportionality is not measured on an individual basis. Rather, it is measured collectively, considering all rate payors. (*Prof. Scientists, supra*, 79 Cal.App.4th at p. 948.)

Thus, permissible fees must be related to the overall cost of the governmental regulation. They need not be finely calibrated to the precise benefit each individual fee payor might derive. What a fee cannot do is exceed the reasonable cost of regulation with the generated surplus used for general revenue collection. An excessive fee that is used to generate general revenue becomes a tax.

■ Reference to the statutory language reveals a specific intention to avoid imposition of a tax. By its terms, section 1525 permits the imposition of fees only for the costs of the functions or activities described, and not for general revenue purposes. Section 1525, subdivision (c) carefully sets out that the fees imposed shall relate to costs linked to issuing, monitoring, enforcing and administering licenses and permits, and lists the recoverable costs in some detail. Section 1551 directs that the fees collected be deposited in the Water Rights Fund, not in the General Fund. Section 1552 describes the

purposes for which the money in the Water Rights Fund may be expended.[21] Although the fees set forth in section 1551 come from various sources, including some that do not involve the services described in section 1525,[22] it cannot be argued that the fees are excessive just because sections 1551 and 1552 list a variety of revenues to be deposited in the Water Rights Fund.

 Section 1552 does not describe how the various revenues deposited in the Water Rights Fund should be allocated. However, no statutory language precludes the segregation and application of collected fees to fund services described in that section.[23]

 Section 1525 does not require the SWRCB to collect anything more than the administrative "costs incurred" in carrying out the functions authorized in its subdivisions (a), (b) and (c). Also, section 1525, subdivision (c) directs the SWRCB to set the fee schedules so that the "total amount of fees collected . . . equals that amount necessary to recover costs incurred in connection with" the Division's administration of the provisions of subdivisions (a) and (b). Similarly, section 1525, subdivision (d)(3) requires the SWRCB to "set the amount of total revenue collected each year through the fees authorized by this section at an amount equal to the revenue levels

[21] Section 1552 provides:

"The money in the Water Rights Fund is available for expenditure, upon appropriation by the Legislature, for the following purposes:

"(a) For expenditure by the State Board of Equalization in the administration of this chapter and the Fee Collection Procedures Law (Part 30 (commencing with Section 55001) of Division 2 of the Revenue and Taxation Code) in connection with any fee or expense subject to this chapter.

"(b) For the payment of refunds, pursuant to Part 30 (commencing with Section 55001) of Division 2 of the Revenue and Taxation Code, of fees or expenses collected pursuant to this chapter.

"(c) For expenditure by the board for the purposes of carrying out this division, Division 1 (commencing with Section 100), Part 2 (commencing with Section 10500) of Division 6, and Article 7 (commencing with Section 13550) of Chapter 7 of Division 7.

"(d) For expenditures by the board for the purposes of carrying out Sections 13160 and 13160.1 in connection with activities involving hydroelectric power projects subject to licensing by the Federal Energy Regulatory Commission.

"(e) For expenditures by the board for the purposes of carrying out Sections 13140 and 13170 in connection with plans and policies that address the diversion or use of water."

[22] Section 1551 provides:

"All of the following shall be deposited in the Water Rights Fund:

"(a) All fees, expenses, and penalties collected by the board or the State Board of Equalization under this chapter and Part 3 (commencing with Section 2000).

"(b) All funds collected under Section 1052, 1845, or 5107.

"(c) All fees collected under Section 13160.1 in connection with certificates for activities involving hydroelectric power projects subject to licensing by the Federal Energy Regulatory Commission."

[23] The Court of Appeal referred to the situation as "an accounting issue that concerns how the monies are treated within the Water Rights Fund."

set forth in the annual Budget Act *for this activity*." (Italics added.) Although the "activity" subject to fees under this section could represent all of the Division's activities, the Court of Appeal correctly noted, "[T]here is nothing in the 'total amount' or 'total revenue' provisions of subdivisions (c) and (d) that requires the SWRCB to set the fees so as to collect anything more than the administrative 'costs incurred' in carrying out the permit functions authorized in subdivisions (a), (b) and (c)." Also, there is a safeguard in subdivision (d)(3) authorizing the SWRCB to "further adjust the annual fees" if it "determines that the revenue collected during the preceding year was greater than, or less than, the revenue levels set forth in the annual Budget Act . . . ." (§ 1525, subd. (d)(3).) Thus, the fees charged under section 1525 are linked to the activities the Division performs.

*"As applied" challenge*

Plaintiffs also contend section 1525 is unconstitutional as applied through the fee schedule in regulation 1066 because the fees are so disproportionate that they are unreasonable. Central to the resolution of this issue is an understanding of the extent and costs of the Division's regulatory "activity." (§ 1525, subd. (d)(3).) The parties diverge in their approach.

As noted, on its face the statutory scheme appears simply to permit the recovery of costs the SWRCB incurs in annual supervision of water usage and the processing of applications for new or modified rights. However, plaintiffs argue the following: (1) While the·Division engages in a variety of activities that benefit all water rights holders, and the general public, it is only authorized to impose fees on 40 percent of rights holders. (2) Because the statutory scheme requires that 100 percent of the Division's annual budget must be recovered through fees, the result is that 40 percent of rights holders are charged for the entire cost of operations that benefit all rights holders and the public at large. This disparity is brought to bear not on the face of the statutes, but in the regulations authorizing fee collection. Plaintiffs claim the regulations impose unreasonable fees because they are so disproportionate to the benefit derived by the fee payors or the burden they place on the regulatory system. (See *Sinclair Paint, supra*, 15 Cal.4th at p. 878.) Therefore, plaintiffs contend the fees operate as a tax and are unconstitutional because the authority for their imposition was not approved by a two-thirds vote of the Legislature.

On the other hand, the SWRCB claims that the fees are proportional and that plaintiffs' focus on the benefits of the regulatory program is misplaced. It argues that the broad benefits of the program must be distinguished from its costs. The Board contends that it can allocate the majority of its regulatory costs to persons subject to the water rights permit and license system because

its costs flow primarily from the administration of that permit and license system. It acknowledges that the benefits that result from the regulation of permits and licenses may be characterized as benefits not only to permit and license holders, but also to the general public, and other water rights holders not subject to its fee system. But, the Board argues, that does not alter the fact that its costs are largely due to its oversight and administration of the permit and license system and not the regulation of the public or other water rights holders. The Board claims that some 95 percent of its time and expense are directed toward servicing and regulating those licensees and permittees against whom the challenged fees were assessed. As we explain below, however, the trial court made no findings on this claim.

In weighing these arguments, we look to our decision in *Sinclair Paint, supra,* 15 Cal.4th 866. There, the plaintiff challenged the fee in question on the basis that the fee was not regulatory in nature, but rather was aimed at raising revenue.[24] We acknowledged that "the term 'special taxes' . . . ' "does not embrace fees charged in connection with regulatory activities which fees do not exceed the reasonable cost of providing services necessary to the activity for which the fee is charged and which are not levied for unrelated revenue purposes." [Citations.]' " (*Sinclair Paint, supra,* 15 Cal.4th at p. 876.) We held that the fee in question was a regulatory fee and not a tax because it was "imposed . . . to mitigate the actual or anticipated adverse effects of the fee payers' operations." (*Id.* at p. 870.) Thus, in *Sinclair Paint,* to determine the tax or fee issue, we directed courts to examine the costs of the regulatory activity and determine if there was a reasonable relationship between the fees assessed and the costs of the regulatory activity. (*Id.* at pp. 870, 878.)[25]

Thus, the question revolves around the scope and the cost of the Division's regulatory activity and the relationship between those costs and the fees imposed. It is further complicated by the fact that not all those who hold water rights are required to pay the fee. Unfortunately, the record before us is insufficient to resolve the "tax or fee" question. The trial court's order lacks sufficient factual findings for us to determine whether the fees, as imposed, were reasonably proportional to the costs of the regulatory program. In fact, at the hearing on plaintiffs' motion for a peremptory writ of mandate, the trial court stated it did not believe it was required to make detailed findings.

---

[24] The plaintiff also did not contend that the fees exceeded the reasonable cost of the services provided or that they were charged for unrelated revenue purposes. (*Sinclair Paint, supra,* 15 Cal.4th at p. 876.)

[25] On remand, we also allowed plaintiffs "to prove . . . that the amount of fees assessed and paid exceeded the reasonable cost of providing the . . . services for which the fees were charged, or that the fees were levied for unrelated revenue purposes." (*Sinclair Paint, supra,* 15 Cal.4th at p. 881.)

██ We have previously noted that "[i]t has long been the general rule and understanding that 'an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration.' [Citation.] This rule reflects an 'essential distinction between the trial and the appellate court . . . that it is the province of the trial court to decide questions of fact and of the appellate court to decide questions of law . . . .' [Citation.] The rule promotes the orderly settling of factual questions and disputes in the trial court, provides a meaningful record for review, and serves to avoid prolonged delays on appeal." (*In re Zeth S.* (2003) 31 Cal.4th 396, 405 [2 Cal.Rptr.3d 683, 73 P.3d 541].) Here, the trial court erred by failing to provide a sufficient record to rule on the question of law. Accordingly, this matter must be remanded. The trial court is directed to make detailed findings focusing on the Board's evidentiary showing that the associated costs of the regulatory activity were reasonably related to the fees assessed on the payors. (*Sinclair Paint, supra*, 15 Cal.4th at p. 870.) Of course, plaintiffs are free to renew their claim that the fees assessed exceeded the reasonable cost of the Division's services. (*Id.* at p. 881.)[26]

The trial court's findings should include whether the fees are reasonably related to the total budgeted cost of the Division's "activity" (see § 1525, subd. (c)), keeping in mind that a government agency should be accorded some flexibility in calculating the amount and distribution of a regulatory fee. Focusing on the activity and its associated costs will allow the trial court to determine whether the assessed fees were reasonably proportional and thus not a tax. (*Sinclair Paint, supra*, 15 Cal.4th at p. 870.) The court must determine whether the statutory scheme and its implementing regulations provide a fair, reasonable, and substantially proportionate assessment of all costs related to the regulation of affected payors.

## C. *Ad Valorem Real Property Tax*

Plaintiffs Northern California Water Association and Central Valley Water Project Association contend that section 1525 imposes an unconstitutional "new ad valorem tax[] on real property." As these parties observe, Proposition 13 prohibits this particular category of new taxes, regardless of legislative approval. (Cal. Const., art. XIII A, § 3.)

The gravamen of the contention is that the water rights obtained through the Division's permits and licenses are interests in real property, and that the license and permit charges imposed under section 1525 are thus taxes

---

[26] Because we remand, we need not address the SWRCB's contention that the "polluter pays" rationale justifies the annual cost allocation because the money collected supports regulatory activities that serve an important public purpose and are a valid exercise of the police power.

improperly based on the ownership of real property interests. However, we have determined above that section 1525 does not, on its face, impose a tax, as opposed to a regulatory fee unaffected by Proposition 13. A fortiori, the face of the statute assesses no new "ad valorem tax[] on real property."

Any further consideration of the ad valorem real property tax issue is premature. We have deemed it necessary to remand for further evidence and findings whether the specific system of charges developed by the SWRCB under the authority of section 1525, subdivision (a) imposes taxes, rather than fees. If the remand leads to the conclusion that the charges are valid fees, not taxes, it will follow that they do not constitute ad valorem taxes on real property.

On the other hand, if the remand results in a conclusion that the current charges are taxes, not fees, those taxes will be unconstitutional under Proposition 13, whether or not they are "ad valorem taxes on real property" (Cal. Const., art. XIII A, § 3, subd. (a)), because they were authorized by less than a two-thirds legislative vote (*ibid.*). Accordingly, we express no further views on this subject.

D. *Federal Contractors*

 *Facial challenge*

 These same plaintiffs also contend that sections 1540 and 1560 are unconstitutional on their face because they violate the supremacy clause of the United States Constitution. (See *McCulloch v. Maryland* (1819) 17 U.S. (4 Wheat.) 316, 425–437 [4 L.Ed. 579].) Under established principles of sovereign immunity, the federal government is immune from state taxation absent its consent. (See *Davis v. Michigan Dept. of Treasury* (1989) 489 U.S. 803, 812–813 [103 L.Ed.2d 891, 109 S.Ct. 1500].)

Section 1540 provides in relevant part: "If the board determines that the person or entity on whom a fee or expense is imposed will not pay the fee . . . based on the fact that the fee payer has sovereign immunity under Section 1560, the board may allocate the fee or expense, or an appropriate portion of the fee or expense, to persons or entities who have contracts for the delivery of water from the person or entity on whom the fee or expense was initially imposed. The allocation of the fee or expense to these contractors does not affect ownership of any permit, license, or other water right, and does not vest any equitable title in the contractors."

 Section 1560 states that the fees imposed under section 1525 apply to the United States and Indian tribes "to the extent authorized under federal

or tribal law." (§ 1560, subd. (a).) Also, section 1560, subdivision (b)(2) provides that the SWRCB should allocate the fees as provided in section 1540 should the United States or an Indian tribe refuse to pay them.

Thus, the plain language of section 1540 provides that if a federal or tribal obligee asserts sovereign immunity under section 1560, the SWRCB may allocate the fee, or a portion of the fee, to persons or entities that have water delivery contracts with the obligee. This practice is permitted under federal law when a private contractor's use of United States property may be taxed.[27] But the allocation is limited to the extent the contractor has beneficial or possessory use of the property. (See *United States v. County of Fresno* (1977) 429 U.S. 452, 462 [50 L.Ed.2d 683, 97 S.Ct. 699] (*County of Fresno*); *U.S. v. Nye County Nevada* (9th Cir. 1991) 938 F.2d 1040, 1042–1043 (*Nye County*); *U.S. v. Hawkins County, Tennessee* (6th Cir. 1988) 859 F.2d 20, 23 (*Hawkins County*).)[28] We reject the contention that the statutory scheme imposes the fees on water rights of the United States and not the private contractors. Clearly, any attempt to impose fees on the federal government would be resisted on sovereign immunity grounds.

Accordingly, neither section 1540 nor section 1560 authorizes imposition of a fee that facially violates the supremacy clause or state and federal rights to equal protection and due process.

*"As applied" challenge*

We next address the implementing regulation. Under regulation 1073, the SWRCB assessed annual costs against the federal contractors, prorating among them the amount of annual fees associated with *all* the Bureau of Reclamation's permits and licenses—over 116 million acre-feet. However, while the Bureau holds all the permits and licenses, the contractors have contractual rights for water delivery over only 6.6 million acre-feet or about 5 percent of all rights held by the Bureau. The Court of Appeal held that regulation 1073 violated the supremacy clause because it required "the federal contractors to pay for the entire amount of annual fees that would otherwise be imposed on the Bureau."

---

[27] When conducting a supremacy clause analysis, federal courts do not distinguish between fees and taxes. (See *Novato Fire Protection Dist. v. U.S.* (9th Cir. 1999) 181 F.3d 1135, 1138–1139; *U.S. v. Anderson Cottonwood Irrigation Dist.* (N.D.Cal. 1937) 19 F.Supp. 740, 741.)

[28] Also, section 1560, subdivision (a) provides that the fees are to be collected only "to the extent authorized under federal or tribal law."

 To successfully defend a supremacy clause challenge to a tax on persons or entities that contract with the federal government, the taxing authority must segregate and tax only the beneficial or possessory interest in the property. (See *County of Fresno, supra,* 429 U.S. at p. 462; *Nye County, supra,* 938 F.2d at pp. 1042–1043; *Hawkins County, supra,* 859 F.2d at p. 23.) Thus, although the SWRCB has the authority to impose regulatory costs on the federal contractors, it can do so only to the extent of the contractors' interest.

Regulation 1073's formula required the federal contractors to pay for the entire amount of annual costs that would be imposed on the Bureau of Reclamation despite the fact that their contractual rights represented a small proportion of the whole. Plaintiffs claim that the result is a disproportionate assessment of fees, thereby making regulation 1073 unconstitutional under the supremacy clause.[29] (*County of Fresno, supra,* 429 U.S. at p. 462.) They contend that the fees should be based on the amount of water they contracted to deliver.

The SWRCB counters that the imposition of the fee should not be limited to the amount of water actually deliverable under the federal contracts. The SWRCB argues that it correctly calculated the fees using the face value of the permitted and licensed water rights. The face value is the total annual amount of water diversion authorized by the federally held permit or license. The SWRCB argues that the amount of diversions authorized by the federally held permits and licenses generally exceeds the amount of the water delivery contracts. The difference between the amount available for diversion and the amount actually delivered is due to factors that include hydrological variation, the need to hold water in storage for future dry years, conveyance and evaporation losses, and water releases to mitigate for project impacts on fish and wildlife.

In addition, the SWRCB argues the following. The Bureau of Reclamation controls the CVP water under permits and licenses issued and regulated by the Water Rights Division. The water is held for two primary purposes: hydroelectric power generation and water supply. The SWRCB sought to

---

[29] We reject plaintiff Northern California Water Association's contention that because the federal government is immune from the fee under federal law there should be no fee imposed on the federal contractors. (*County of Fresno, supra,* 429 U.S. at p. 453.)

Plaintiffs also argue that the annual fee is unconstitutional because the SWRCB failed to provide any evidence showing that this amount is reasonably related to the cost of the regulatory burden. This argument fails. The SWRCB presented evidence to the trial court in support of the amount charged for the annual fee.

apportion a fair share of the regulatory costs associated with these permits and licenses to those water users who benefit through their water delivery contracts with the Bureau. As a result, the SWRCB initially discounted the value of the permits and licenses by approximately 50 percent to account for hydroelectric power generation use, then allocated to the federal contractors a pro rata share of the regulatory costs to the remaining value of the Bureau's permits and licenses that related to water supply. Accordingly, the Board argues, these charges were reasonably calculated because they apportioned the Division's costs of administering the Bureau's permits and licenses, exclusive of those costs related to hydroelectric generation, to the federal contractors who benefited from the receipt of the water.

The SWRCB asserts that this is a fair apportionment of costs that withstands a supremacy clause challenge. It argues the federal contractors' beneficial interest is not properly valued by a simple calculation of the proportion of total CVP water the contractors are entitled to receive under their contracts. It claims that a fair determination of the federal contractors' beneficial interest must include consideration of the system that supports and ensures the delivery of the amount contracted, not just the amount of water contracted for delivery. Thus, the SWRCB proposes that the federal contractors have a taxable interest in the "face value" of the Bureau's water rights held under permits and licenses, less any amounts used for hydroelectric generation.

We agree with the SWRCB. However, again due to conflicting factual assertions and an inadequate record, we cannot determine how much of the total water in question is used to support the water delivered and can thus be allocated to the federal contractors' beneficial interest. Accordingly, we remand for the trial court to determine the contractors' beneficial interest and the value of that interest. The trial court shall make findings as to whether the Board has fairly evaluated the federal contractors' beneficial interest, such that water not actually under contract for delivery is fairly attributable to the value of the delivery contracts themselves.[30]

## DISPOSITION

We affirm the Court of Appeal's judgment holding that the fee statutes at issue are facially constitutional. However, the Court of Appeal's judgment is

---

[30] Because we reverse the Court of Appeal's judgment and remand this matter to the trial court so it can make findings and a determination as to whether the fees were improperly imposed, we need not address plaintiffs' claim that the Court of Appeal erred by limiting refunds.

reversed as to its determination that the statutes and their implementing regulations are unconstitutional as applied. We remand this matter for the Court of Appeal to remand to the trial court for proceedings consistent with this opinion.

Kennard, Acting C. J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and George, J.,* concurred.

**MORENO, J.,** Concurring.—I concur in the majority opinion. I write separately to offer these additional reflections on the "as applied" challenge to the fee as a tax.

A charge that is labeled a regulatory fee may indeed be a tax in disguise if "the amount of fees assessed and paid exceeded the reasonable cost of providing the [regulatory] services for which the fees were charged, or [if] the fees were levied for unrelated revenue purposes." (*Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 881 [64 Cal.Rptr.2d 447, 937 P.2d 1350].) Here, there is no allegation that the fees in question are being used for unrelated revenue purposes. Rather, it is contended that only 40 percent of water rights holders are being charged a fee that by right should be charged to all water rights holders, and therefore the fee is not sufficiently linked to the regulatory costs generated by those on whom the fee is imposed and constitutes a tax.

Every government entity that imposes a regulatory fee must decide who should be subject to the fee and who should not. A number of factors may go into that decision, including assessments of the regulatory burdens imposed by the various actors and the administrative convenience of imposing the fee. As the majority states: " 'Legislators "need only apply sound judgment and consider 'probabilities according to the best honest viewpoint of informed officials' in determining the amount of the regulatory fee." [Citation.]' " (Maj. opn., *ante*, at p. 438.) So, too, legislators and regulators need only make reasonable decisions about who should be subject to a regulatory fee.

In the present case, the State Water Resources Control Board claims that "some 95 percent of its time and expense are directed toward servicing and regulating those licensees and permittees against whom the challenged fees were assessed." (Maj. opn., *ante*, at p. 441.) The support for this contention

---

*Retired Chief Justice of California, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

stems primarily from a document produced by the board on April 15, 2004, shortly after the present litigation commenced. Because of the uncertain reliability of this document, as well as the trial court's lack of findings, remand is appropriate to determine whether the board's decisions regarding who would be subject to the fee were reasonable.

Werdegar, J., concurred.

The petition of both appellants and respondent for a rehearing was denied April 20, 2011, and the opinion was modified to read as printed above. Cantil-Sakauye, C. J., did not participate therein.