Filed 7/11/14 (unmodified opn. attached)

# CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION ONE

| | |
|---|---|
| RUDOLPH H. LIGHT et al., | |
|     Plaintiffs and Respondents, | |
| v. | A138440 |
| STATE WATER RESOURCES CONTROL BOARD, | (Mendocino County |
|     Defendant and Appellant. | Super. Ct. No. SC UK CVG 1159127) |
| RUSSIAN RIVER WATER USERS FOR THE ENVIRONMENT et al., | ORDER MODIFYING OPINION AND DENYING REHEARING AND REQUEST FOR JUDICIAL NOTICE |
|     Plaintiffs and Respondents, | |
| v. | [NO CHANGE IN JUDGMENT] |
| STATE WATER RESOURCES CONTROL BOARD, | |
|     Defendant and Appellant. | |

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.E.

BY THE COURT:

It is ordered that the opinion filed herein on June 16, 2014, be modified as follows:

1. On page 7, at the end of the first full paragraph on the page, add as footnote 5 the following footnote, which will require renumbering of all subsequent footnotes:

> [5] In a petition for rehearing, the Lights point out that, if read literally, Regulation 862 would ban all diversion for frost protection immediately, since it states that all such diversion "[a]fter March 12, 2012" must occur pursuant to a WDMP, and no WDMP's yet exist. We construe the regulation in light of the accompanying resolution, which states it will be "implemented using a phased approach" and does not anticipate the formulation of corrective action plans until over two years into the implementation process. In other words, we interpret Regulation 862 to ban frost protection diversion that does not conform to a WDMP, but only after an appropriate time for the formulation of WDMP's has occurred. Because the implementation benchmarks in the resolution are keyed to actual dates that have long since passed, the Board's stated implementation schedule is no longer feasible. We assume, as noted in footnote 25, *post*, the Board will, upon remand, follow an implementation schedule that will preclude enforcement until an appropriate period for the formulation of WDMP's has passed.

2. On page 44 of the opinion, in the last sentence on the page, delete the following language: "The regulation itself does not require growers to cease diversion until a WDMP has been formulated and approved (Cal. Code Regs., tit. 14, § 15168, subd. (c)(4)), and," so that the sentence reads:

The resolution adopting the regulation states compliance will not be enforced until at least two years after the regulation becomes effective.

There is no change in the judgment.

Respondents' petitions for rehearing and request for judicial notice are denied.

Dated:

_____

Margulies, Acting P.J.

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| RUDOLPH H. LIGHT et al.,<br><br>        Plaintiffs and Respondents,<br><br>v.<br><br>STATE WATER RESOURCES<br>CONTROL BOARD,<br><br>        Defendant and Appellant.<br><br>RUSSIAN RIVER WATER USERS FOR<br>THE ENVIRONMENT et al.,<br><br>        Plaintiffs and Respondents,<br><br>v.<br><br>STATE WATER RESOURCES<br>CONTROL BOARD,<br><br>        Defendant and Appellant. | A138440<br><br>(Mendocino County<br>Super. Ct. No. SC UK CVG 1159127) |

In April 2008, a particularly cold month in a dry year, young salmon were found to have been fatally stranded along banks of the Russian River stream system, which drains Sonoma and Mendocino Counties. Federal scientists concluded the deaths were caused by abrupt declines in water level that occurred when water was drained from the streams and sprayed on vineyards and orchards to prevent frost damage. Following a series of hearings and the preparation of an environmental impact report, the State Water Resources Control Board (Board) adopted a regulation that is likely to require a reduction

___

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.E.

in diversion of water from the stream system for frost protection, at least under certain circumstances.  The regulation itself contains no substantive regulation of water use, instead delegating the task of formulating regulatory programs to local governing bodies composed of the diverting growers themselves.  The regulation declares that any water use inconsistent with the programs, once they have been formulated and approved by the Board, is unreasonable and therefore prohibited.  The trial court granted a writ of mandate invalidating the regulation on several grounds.  We reverse.

Foremost among plaintiffs' grounds for challenging the regulation is their contention the Board lacks the regulatory authority to limit water use by riparian users and early appropriators, whose diversion is beyond the permitting authority of the Board. Although the Board has no authority to require such users to obtain a permit to divert, there is no question it has the power to prevent riparian users and early appropriators from using water in an unreasonable manner.  We conclude that, in regulating the unreasonable use of water, the Board can weigh the use of water for certain public purposes, notably the protection of wildlife habitat, against the commercial use of water by riparian users and early appropriators.  Further, the Board may exercise its regulatory powers through the enactment of regulations, as well as through the pursuit of judicial and quasi-judicial proceedings.  Because this is a facial challenge, our ruling is a narrow one, grounded in the general authority of the Board; we have no occasion to rule on the validity of any particular substantive regulation that might be approved by the Board in the process of implementation.

We also conclude the Board properly found the regulation to be necessary to enforce water use statutes and did not unlawfully delegate its authority by requiring local governing bodies to formulate the substantive regulations.  Finally, we find no error in the Board's certification of the environmental impact report.

## I.  BACKGROUND

The stream system of the Russian River is home to three species of salmon classified as either threatened or endangered under the federal Endangered Species Act of 1973 (16 U.S.C. § 1531 et seq.).  The river and its tributaries, which flow to the sea

2

through Mendocino and Sonoma Counties, contain over 1,700 miles of potential salmon habitat.  In late fall and winter, adult salmon enter the river from the ocean, swim upstream, and lay eggs in gravel on the streambed.  The eggs typically hatch in late winter, and the fry emerge from the gravel after four to eight weeks and move to shallow water, typically near the margins of the stream.  Here the young salmon, known as salmonids, spend several months, moving into deeper water as they mature.[1]

In April 2008, when unseasonably cold weather followed an exceptionally dry winter, the National Marine Fisheries Service (Fisheries Service) discovered two episodes of fatal strandings of salmonids in the mainstem Russian River and a tributary stream.  "Strandings" occur when salmonids in shallow areas of the watercourse are left without water or are trapped in isolated pools.  There is evidence suggesting the problem is not necessarily one of low water levels per se, but of sudden decreases in water level, which allow the salmonids insufficient time or opportunity to seek the protection of deeper water.  Because the salmonids spend their time in shallower water near the stream banks, they may be particularly susceptible to such sudden decreases.  Extrapolating from the available limited data, the Fisheries Service reached a "coarse but conservative" estimate that some 25,000 salmonids had been killed throughout the stream system in the April 2008 events.

The Fisheries Service blamed the strandings, in large part, on agriculturalists, especially grape growers, located along the system.  The watershed of the Russian River is home to over 60,000 acres of vineyards, of which 70 percent are within 300 feet of salmonid habitat.  Grape plants are particularly susceptible to frost damage when new growth appears in the spring.  The newly emerged vegetation is delicate, and a tissue-killing freeze can result in substantial crop loss.  A time-tested method of preventing frost damage is to spray the new growth with water, which by freezing on the plants insulates them against the colder air.  If a number of growers anticipating a frost all draw their

---

[1] The life cycles of the three species of salmon differ somewhat, but this general summary is characteristic of all three.

water directly from a stream at the same time, the net effect can be a sudden decrease in the volume of flowing water. The problem occurs both because the growers' diversion of water is effectively synchronized—all growers in a threatened area must frost-protect at the same time—and because the overhead sprayers necessary for frost protection consume relatively large quantities of water. Examining data for March through May 2008, the Fisheries Service found an association between near-freezing air temperatures and sudden and substantial drops in the flow of a stream in the system.[2]

In a letter, the Fisheries Service urged the Board to undertake regulatory activity to reduce the risk of frost protection-related salmonid deaths. Although the Fisheries Service pointed the finger at growers, other factors were potentially involved. Most obviously, the affected area of the stream system is downriver of two large reservoir lakes created by the Coyote and Warm Springs Dams. The pace of water release from these dams directly affects the level of water in the system. Following the discovery of the stranding deaths, the agency responsible for controlling the release of water from the dams, the Sonoma County Water Agency (SCWA), experimented with anticipatory releases of water to counteract the effects of frost protection diversion. The SCWA concluded such releases were impractical, given the long time, up to 14 hours, necessary for the released water to reach the more distant portions of the stream system and the difficulty in predicting frost events, which gave rise at times to wasteful "false alarm" releases. In addition, the coordinated nature of the frost protection diversions made it difficult to counteract their impact. The SCWA told the Board additional anticipatory releases would be ineffective in preventing the sudden drawdowns.

On the other hand, while protecting sensitive crops from frost is of critical commercial importance, the practice can be managed to reduce the immediate demand on

---

[2] Of the total of 1,778 water rights claims in the Russian River watershed, 533 provide for the diversion of water for frost protection. A witness before the Board compared air temperature and water flow at a gauge in the Russian River over the 17 years prior to 2009 and found a correlation between the occurrence of low air temperatures and rapid drawdown. The intensity of the drawdowns had increased significantly in recent years. Such drawdowns did not occur in areas without vineyards.

stream flows.  Growers can minimize their use of sprayed water by precisely targeting truly threatened acreage, and better frost forecasting and temperature monitoring can avoid unnecessary sprayings.  Many growers have constructed basins to collect water at times of high stream flow.  Drawing water from such basins or from wells, rather than directly from the stream system, serves the same frost protection purpose without an immediate impact on stream flow.  In addition, there are alternative methods, such as wind machines, heaters, and cold air drains, that will work under certain circumstances to protect against frost damage.

Following the 2008 discovery of salmonid deaths, the Fisheries Service formed a task force and attempted to organize voluntary efforts to reduce the impact of frost protection on the stream system.  While it praised the efforts of participating growers, the Fisheries Service eventually concluded the problem could not be managed through voluntary efforts.  The submitted proposals for voluntary action generally did not address diversion in the tributary streams of the river, where the problem was most acute, and the inability to compel the compliance of all growers with a voluntary plan made success unlikely.  Based on the Fisheries Service's experience, the Board concluded voluntary efforts would not solve the problem.

Following a series of public hearings and the preparation of an environmental impact report, in September 2011 the Board adopted a regulation addressing diversion for frost protection, codified as California Code of Regulations, title 23, section 862 (hereafter Regulation 862).  Regulation 862 applies to "any diversion of water from the Russian River stream system . . . for purposes of frost protection from March 15 through May 15."[3]  (Regulation 862, subd. (a).)  The section contains no substantive regulation of water diversion for the purpose of frost protection, instead delegating the development of

---

[3] The regulation actually applies only to that portion of the Russian River stream system located downstream of the two major dams.  (Regulation 862, subd. (a).)  Because salmon cannot migrate past the dams, there is no risk to their safety from water diversion above the dams.  The dates were apparently selected because they represent the time during which new plant growth typically coincides with the risk of freezing temperatures.

5

such regulation to "water demand management program[s]" (WDMP's). Regulation 862 is silent as to how and by whom the WDMP's are to be developed, but they must be administered by "an individual or governing body . . . capable of ensuring that the requirements of the program are met." (*Id.*, subd. (b).) The parties reasonably assume the WDMP's will be created by self-organized groups of agricultural diverters, who will act as the "governing bodies." Each WDMP must be submitted annually to the Board for approval. (*Ibid.*)

As described in Regulation 862, the fundamental functions of the WDMP's are to develop and implement methods for monitoring the "stage," or height, of the affected watercourses, determining when that stage poses a threat to young salmon, and responding with "corrective actions" to reduce a threat once detected. (*Id.*, subds. (b), (c)(2)–(4).) Among other requirements, the WDMP must contain an inventory of potential diverters "within the area subject to the WDMP," including diverters who "declined to participate," a stream stage monitoring program, and a plan for managing frost protection diversion to prevent strandings. (*Id.*, subds. (c)(1)–(5).)

Regarding potential "corrective actions," Regulation 862, subdivision (c)(4) states: "If the governing body determines that diversions for purposes of frost protection have the potential to cause stranding mortality, the governing body shall notify the diverter(s) of the potential risk. The governing body, in consultation with the diverters, shall develop a corrective action plan that will prevent stranding mortality. Corrective actions may include alternative methods for frost protection, best management practices, better coordination of diversions, construction of offstream storage facilities, real-time stream gage and diversion monitoring, or other alternative methods of diversion. . . . In developing the corrective action plan the governing body shall consider the relative water right priorities of the diverters . . . ."

Once a program has been developed and approved, "[t]he diverters shall implement corrective actions in accordance with the corrective action plan, or cease diverting water for frost protection." (Regulation 862, subd. (c)(4).) Reinforcing this ban, Regulation 862 declares, "The diversion of water in violation of this section,

6

including the failure to implement the corrective actions included in any corrective action plan developed by the governing body, is an unreasonable method of diversion and use and a violation of Water Code section 100, and shall be subject to enforcement by the board." (*Id.*, subd. (e).)

In the resolution adopting Regulation 862, the Board stated the portion of the regulation requiring corrective actions would not be implemented immediately. Instead, the resolution establishes a schedule allowing for the collection and analysis of baseline data during the first two and a half years following adoption.

Regulation 862 was challenged in two petitions for a writ of mandate filed in Mendocino and Sacramento Counties. The Mendocino County action was filed by Rudolph H. Light and Linda Light, owners of 23 acres of vineyard in the affected area that are crossed by a stream from which the Lights draw water for purposes of irrigation and frost protection. The Sacramento County action was filed by a grower association, three individuals, and a limited partnership (the Sacramento plaintiffs), all of whom either grow grapes in the affected area or have members who do so.[4] Both petitions alleged, for a variety of reasons, that Regulation 862 would unlawfully interfere with plaintiffs' use of water drawn from the Russian River stream system. The petitions were consolidated for decision in Mendocino County Superior Court. In February 2012, the trial court stayed enforcement of Regulation 862 pending resolution of the litigation.

The trial court later entered a 41-page decision finding the Board's action unlawful on the following grounds: (1) the Board exceeded its authority in adopting a regulation that limited the use of water by riparian users; (2) the regulation violated the "rule of

---

[4] The Sacramento plaintiffs are Russian River Water Users for the Environment, an unincorporated association of Mendocino and Sonoma County residents and entities interested in fruit and winery operations, Allan Nelson, a Sonoma County vineyard owner, Billy Munselle, an Alexander Valley grape grower, Robert Terry Rosetti, a grape and pear grower in Mendocino County, and Redwood Ranch and Vineyards, LP, which owns vineyard land adjoining the Russian River. As a regular part of their business operations, Munselle and Rosetti draw water from the Russian River stream system for frost protection purposes.

priority," which governs the manner in which insufficient water is divided among users; (3) the regulation improperly delegated regulatory authority to the WDMP's; and (4) the declaration of necessity for the regulation was not supported by substantial evidence. Given its ruling, the trial court initially declined to rule on plaintiffs' claims under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; CEQA), but in a subsequent order the court found several flaws in the environmental impact report prepared in connection with Regulation 862. The court entered judgment directing issuance of a peremptory writ of mandate requiring the Board to set aside its certification of the environmental impact report and its adoption of Regulation 862.

The Board has appealed the trial court's judgment.

## II. DISCUSSION

### A. *Legal Background*

We begin with a summary of four areas of law that converge in the resolution of plaintiffs' claims.

#### 1. *California's Dual System of Water Rights and the Rule of Priority*

Ownership of California's water is vested generally in the state's residents, but individuals and entities can acquire "water rights," the right to divert water from its natural course for public or private use. (Wat. Code,[5] § 102; see generally *United States v. State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 100 (*United States*).) California maintains a "dual system" of water rights, which distinguishes between the rights of "riparian" users, those who possess water rights by virtue of owning the land by or through which flowing water passes, and "appropriators," those who hold the right to divert such water for use on noncontiguous lands. (*El Dorado Irrigation Dist. v. State Water Resources Control Bd.* (2006) 142 Cal.App.4th 937, 961 (*El Dorado*).) For historical reasons, California further subdivides appropriators into those whose water

---

[5] Unless otherwise indicated, subsequent statutory references are to the Water Code.

8

rights were established before and after 1914.[6] Post-1914 appropriators may possess water rights only through a permit or license issued by the Board, and their rights are circumscribed by the terms of the permit or license. Riparian users and pre-1914 appropriators need neither a permit nor other governmental authorization to exercise their water rights. (*California Farm Bureau Federation v. State Water Resources Control Bd.* (2011) 51 Cal.4th 421, 428–429 (*Farm Bureau*).) Inevitably, given the nature of the resource, "water rights are limited and uncertain. The available supply of water is largely determined by natural forces." (*United States*, at p. 104; see also Gray, *The Uncertain Future of Water Rights in California: Reflections on the Governor's Commission Report* (2005) 36 McGeorge L. Rev. 43, 49–51 [discussing factors creating uncertainty in the exercise and administration of water rights].)

The differences between and among riparian users and appropriators become most pronounced when the available supply of water is inadequate to satisfy the needs of all those holding water rights. Under the "rule of priority," which governs diversion in such circumstances, the rights of riparian users are paramount. Although riparian users must curtail their use proportionately *among themselves* in times of shortage, they are entitled to satisfy their reasonable needs first, before appropriators can even begin to divert water. (*United States, supra*, 182 Cal.App.3d at p. 104.) As a result, appropriators may be deprived of all use of water when the supply is short. In turn, senior appropriators— those who acquired their rights first in time—are entitled to satisfy their reasonable needs, up to their full appropriation, before more junior appropriators become entitled to any water. (*Id.* at pp. 104–105; *North Kern Water Storage Dist. v. Kern Delta Water Dist.* (2007) 147 Cal.App.4th 555, 561.)

---

[6] In 1913, the Legislature enacted the Water Commission Act, which, among other provisions, required any new appropriations to occur by permit, issued by a predecessor of the Board. Appropriations established prior to the Act's effective date in late 1914 were grandfathered. (See generally *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 741–742.)

## 2. *The Rule of Reasonableness*

Water use by both riparian users and appropriators is constrained by the rule of reasonableness, which has been preserved in the state Constitution since 1928. (Cal. Const., art. X, § 2; hereafter Article X, Section 2.) Article X, Section 2 was a direct response to a 1926 judicial decision, *Herminghaus v. South. California Edison Co.* (1926) 200 Cal. 81, in which the Supreme Court affirmed an injunction that prevented the diversion of San Joaquin River water to Southern California. The court reasoned there was no water to spare because riparian users of the river were entitled to receive its "usual and ordinary flow," which the court found to include even its floodwaters, of which the users made little use. (*Id.* at pp. 90, 103.) The Constitution was amended two years later effectively to overrule *Herminghaus* by adding what is now codified as Article X, Section 2. (*Joslin v. Marin Mun. Water Dist.* (1967) 67 Cal.2d 132, 138 (*Joslin*).) Article X, Section 2 states, in relevant part: "The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses . . . ." (Cal. Const., art. X, § 2.) As the Supreme Court recognized soon after Article X, Section 2 was added, the rule limiting water use to that reasonably necessary "appl[ies] to the use of all water, under whatever right the use may be enjoyed." (*Peabody v. City of Vallejo* (1935) 2 Cal.2d 351, 367–368 (*Peabody*).) The rule of reasonableness is now "the overriding principle governing the use of water in California." (*People ex rel. State Water Resources Control Bd. v. Forni* (1976) 54 Cal.App.3d 743, 750 (*Forni*).)

California courts have never defined, nor as far as we have been able to determine, even attempted to define what constitutes an unreasonable use of water, perhaps because

the reasonableness of any particular use depends largely on the circumstances. (*Peabody, supra,* 2 Cal.2d at p. 368.) "What may be a reasonable beneficial use, where water is present in excess of all needs, would not be a reasonable beneficial use in an area of great scarcity and great need. What is a beneficial use at one time may, because of changed conditions, become a waste of water at a later time." (*Tulare Dist. v. Lindsay-Strathmore Dist.* (1935) 3 Cal.2d 489, 567.) In this regard, the *Joslin* court commented, "Although, as we have said, what is a reasonable use of water depends on the circumstances of each case, such an inquiry cannot be resolved *in vacuo* isolated from statewide considerations of transcendent importance. Paramount among these we see the ever increasing need for the conservation of water in this state, an inescapable reality of life quite apart from its express recognition in [Article X, Section 2]." (*Joslin, supra*, 67 Cal.2d at p. 140, fn. omitted; see similarly *In re Waters of Long Valley Creek Stream System* (1979) 25 Cal.3d 339, 354 ["it appears self-evident that the reasonableness of a riparian use cannot be determined without considering the effect of such use on all the needs of those in the stream system [citation], nor can it be made '*in vacuo* isolated from statewide considerations of transcendent importance' "].) Few decisions have ruled on the reasonableness of a specific use of water, but in separate cases the Supreme Court has concluded, essentially as self-evident, that the use of water for the sole purpose of flooding the land to kill gophers and squirrels is unreasonable (*Tulare Dist.*, at p. 568), as is the use of floodwaters solely to deposit sand and gravel on flooded land (*Joslin*, at p. 141).

### 3. *Public Trust Doctrine*

Existing alongside the rule of reasonableness is a second doctrine imposing at least a potential limit on private uses of water. As the Supreme Court has explained that doctrine, the state holds the navigable waterways in "public trust" for the benefit of state residents. (*National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 434, 437 (*Audubon Society*).) In *Audubon Society*, the plaintiffs challenged long-standing water use permits issued by the Board that, by allowing the diversion of water from streams feeding Lake Mono, had resulted in an environmentally destructive decrease in the lake's

level.  In declining to reconsider the permits, the Board concluded it was required to allocate all available water for beneficial use by appropriators, notwithstanding the potential environmental harm such diversions would cause.  (*Id.* at p. 427.)  The *Audubon Society* court required the Board to reconsider the permits, taking into account the public trust doctrine.  (*Id.* at pp. 446–447.)  Although the doctrine originally protected navigable waterways for the purposes of navigation, commerce, and fishing, *Audubon Society* extended the geographic scope of the doctrine to non-navigable streams that feed navigable waterways, and it expanded the purpose of the doctrine to the preservation of water's function as natural habitat.  (*Id.* at pp. 434–435, 437; see *Center for Biological Diversity, Inc. v. FPL Group, Inc.* (2008) 166 Cal.App.4th 1349, 1361 ["an important purpose of the public trust over bodies of water is to protect the habitat for wildlife"].)

In defining the role of the public trust doctrine in water rights policy, *Audubon Society* recognized that "the public trust doctrine and the appropriative water rights system administered by the Water Board developed independently of each other.  Each developed comprehensive rules and principles which, if applied to the full extent of their scope, would occupy the field of allocation of stream waters to the exclusion of any competing system of legal thought."  (*Audubon Society, supra*, 33 Cal.3d at p. 445.)  In bringing the two together, the court held the doctrine (1) prevents any party from acquiring a vested right to appropriated water in a manner harmful to the interests protected by the public trust; (2) "the Legislature, acting directly or through an authorized agency such as the Water Board, has the power to grant usufructuary licenses that will permit an appropriator to take water . . . , even though this taking does not promote, and may unavoidably harm, the trust uses at the source stream"; and (3) "[t]he state has an affirmative duty to take the public trust into account in the planning and allocation of water resources, and to protect public trust uses whenever feasible."[7]  (*Audubon Society,* at pp. 445–446, fn. omitted.)

---

[7] Although subsequent Supreme Court cases have acknowledged the public trust doctrine, they have not elaborated on its role in California jurisprudence.  (E.g., *Environmental Protection Information Center v. California Dept. of Forestry & Fire*

12

## 4. *The Board*

The Board was created as the State Water Commission in 1913 to administer the appropriation of water for beneficial purposes. As originally created, the Board had the "limited role" of granting use rights to water that was not being applied to beneficial purposes and was not otherwise appropriated. (*Audubon Society, supra*, 33 Cal.3d at p. 442.) "[T]he function of the Water Board was restricted to determining if unappropriated water was available; if it was, and no competing appropriator submitted a claim, the grant of an appropriation was a ministerial act." (*Ibid.*) The enactment of Article X, Section 2, however, "radically altered water law in California and led to an expansion of the powers of the board." (*Audubon Society*, at p. 442.) Through subsequent legislation and judicial decisions, "the function of the Water Board has steadily evolved from the narrow role of deciding priorities between competing appropriators to the charge of comprehensive planning and allocation of waters." (*Id.* at p. 444.)

As currently constituted, the Board "has been granted broad authority to control and condition water use, insuring utilization consistent with public interest." (*Environmental Defense Fund, Inc. v. East Bay Mun. Utility Dist.* (1977) 20 Cal.3d 327, 342 (*EBMUD*).) Its enabling statute describes the Board's function as "to provide for the orderly and efficient administration of the water resources of the state" and grants it the power to "exercise the adjudicatory and regulatory functions of the state in the field of water resources." (§ 174.) In that role, the Board is granted "any powers . . . that may be necessary or convenient for the exercise of its duties authorized by law" (§ 186, subd. (a)), including the power to "make such reasonable rules and regulations as it may from time to time deem advisable . . . ." (§ 1058.) Among its other functions, "the . . .

---

*Protection* (2008) 44 Cal.4th 459, 515; *In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1154.) *Audubon Society* remains the most recent Supreme Court authority governing application of the doctrine in this context. A more recent discussion is found in our decision in *Citizens for East Shore Parks v. State Lands Com.* (2011) 202 Cal.App.4th 549, 570–571, 573–578.)

13

board shall take all appropriate proceedings or actions before executive, legislative, or judicial agencies to prevent waste, unreasonable use, unreasonable method of use, or unreasonable method of diversion of water in this state." (§ 275.) The Board's authority to prevent unreasonable or wasteful use of water extends to all users, regardless of the basis under which the users' water rights are held. (*Farm Bureau, supra*, 51 Cal.4th at p. 429.)

## B. *Validity of Regulation 862*

In contending Regulation 862 is invalid, plaintiffs argue (1) the Board lacks the authority to enact regulations governing the unreasonable use of water, (2) the Board lacks the authority to limit the use of water by riparian and pre-1914 appropriators, and (3) Regulation 862 improperly violates the rule of priority. Whether a particular regulation is within the scope of authority conferred by the Legislature on an administrative agency is a legal issue we review de novo. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11, fn. 4; *Southern California Gas Co. v. South Coast Air Quality Management Dist.* (2011) 200 Cal.App.4th 251, 268.)

### 1. *The Board's Authority to Enact Regulations Governing the Unreasonable Use of Water*

The Board characterized the regulatory premise of Regulation 862 as follows: "a diversion of water that is harmful to salmonids is an unreasonable use of water if the diversion can be managed to avoid the harm." (State Water Resources Control Bd., Notice of Preparation and Public Scoping Meeting Mem. (Oct. 27, 2010) p. 2.) In finding the Board lacked the authority to enact Regulation 862, the trial court recognized the Board had regulatory authority over the unreasonable use of state waters. It held, however, that this authority was limited, at least as to riparian users, to pursuing enforcement actions in the courts against allegedly unreasonable users, rather than enacting regulations to preclude unreasonable use.

Neither decisional law nor the governing statutes support the trial court's limited vision of the Board's regulatory authority. As noted above, the Board is charged with acting to prevent unreasonable and wasteful uses of water, regardless of the claim of right

14

under which the water is diverted.  (§ 275; *Farm Bureau, supra*, 51 Cal.4th at p. 429.)
The Board's authority to enact regulations in furtherance of this purpose was addressed
and upheld nearly 40 years ago in *Forni*.  In that case, the Board had adopted a
regulation, then codified as section 659 of title 23 of the California Administrative Code,
which held, " 'diversion of water from the Napa River after March 15 for frost protection
except to replenish water stored in reservoirs prior to March 15 is an unreasonable
method of diversion within the meaning of [Article X, Section 2] and Section 100 of the
Water Code.' "  The regulation was motivated by a lack of adequate water to satisfy the
frost protection demands of all users.[8]  (*Forni, supra*, 54 Cal.App.3d at pp. 748 & 752,
fn. 4.)  Based on that regulation, the Board brought an action to enjoin certain vineyard
owners from drawing water from the river for purposes of frost protection.  (*Id.* at
p. 747.)  The defendants were granted summary judgment on the ground the Board lacked
the authority to prohibit or limit the use of water by riparian users.  (*Id.* at p. 748.)  In
reversing the trial court's judgment invalidating the regulation, the court rejected the
argument, made on several grounds, that the Board lacked the authority to interfere with
water use by riparian users.  (*Forni*, at pp. 751–752.)  The court then upheld the Board's
power to enact a regulation governing reasonable use.  Without extensive discussion, the
court concluded the Board had not exceeded its authority in enacting the regulation
because, "[p]roperly construed, section 659 amounts to no more than a policy statement
which leaves the ultimate adjudication of reasonableness to the judiciary."  (*Id.* at p. 752.)

Plaintiffs rightly point out that, despite *Forni*'s refusal to invalidate the regulation,
its resolution of the issue was not a ringing endorsement of the Board's power to enact
regulations governing the unreasonable use of water.  In effect, *Forni* chose to treat the
regulation as an advisory statement of policy that left to the courts the ultimate authority

---

[8] The regulation is now codified as California Code of Regulations, title 23,
section 735 and states, "all diversions of water from the [Napa River] stream system
between March 15 and May 15 determined to be significant by the board or a court of
competent jurisdiction shall be considered unreasonabl[e] and a violation of Water Code
Section 100 unless controlled by a watermaster administering a board or court approved
distribution program."  (*Id.,* subd. (a).)

to determine whether a particular use of water was reasonable. (*Forni, supra*, 54 Cal.App.3d at p. 752.) Of course, to the extent the bald declaration of unreasonableness in former section 659 constituted a valid "policy statement" under *Forni*, Regulation 862 is similarly valid. At a minimum, *Forni*'s holding would require a reversal of the trial court's invalidation of the regulation on the issue of authority.

Yet to the extent *Forni*'s ruling was based on the implicit rationale that only the judiciary has the power to declare a particular water use unreasonable, we conclude *Forni* construed the Board's authority too narrowly. Subsequent judicial decisions have rejected the contention that the judiciary is vested with sole authority over unreasonable use, most forcefully *California Trout, Inc. v. State Water Resources Control Bd.* (1989) 207 Cal.App.3d 585 (*California Trout*). At issue in *California Trout* was the validity of a Board-issued use permit conditioned on compliance with a state statute requiring the owner of any dam to "allow sufficient water at all times to pass . . . around or through the dam, to keep in good condition any fish that may be planted or exist below the dam." (Fish & G. Code, § 5937.) Among other arguments, a plaintiff contended "the Legislature may not impose a categorical priority for one use of water because reasonableness of use requires comparison of contending alternative uses which is an adjudicative question that cannot be constrained by a statutory rule." (*California Trout*, at p. 622.) The court rejected the contention the Legislature lacked the power to enact broad rules governing reasonableness, using an analogy to the doctrine of reasonable conduct in tort law. As the court explained, "it is often asserted that '[w]hat constitutes a reasonable use or method of diversion is ordinarily a question of fact.' [Citation.] Actually, since what occurs is development of a standard of reasonableness on the facts of the case it should be described as a making of law for the particular case. [Citation.] The typical example of such a process is case-by-case determination of the standard of reasonable care in the law of tort. However, the fact that, ordinarily, the standard of reasonableness is fixed ad hoc does not impel the view that the Legislature has no power to fashion rules concerning reasonableness, e.g., by enacting statutory safety obligations which become the basis of negligence per se." (*Id.* at p. 624.) After analyzing the text

16

and judicial construction of Article X, Section 2, the court concluded, "there is 'broad legislative authority for the conservation and regulation of scarce water resources . . . .' [Citation.]  That authority is sufficient to authorize the Legislature to enact statutes which determine the reasonable uses of water." (*California Trout*, at p. 625.)[9]

If, as *California Trout* holds, the Legislature has the power to enact general rules governing the reasonable use of water, the Board has a similar regulatory authority.  The Water Code authorizes the Board, in carrying out its statutory duty to administer the state's water resources, to "exercise the adjudicatory and regulatory functions of the state." (§ 174.)  In that role, the Board is granted "any powers . . . that may be necessary or convenient for the exercise of its duties authorized by law" (§ 186, subd. (a)), including the authority to "make such reasonable rules and regulations as it may from time to time deem advisable . . . ." (§ 1058.)  Given the Board's statutory charge to "prevent waste, unreasonable use, unreasonable method of use, or unreasonable method of diversion of water in this state" (§ 275) and the recognized power of the Legislature to pass legislation regulating reasonable uses of water (*California Trout, supra*, 207 Cal.App.3d at pp. 624–625), the Board's grant of authority to "exercise the . . . regulatory functions of the state" (§ 174) necessarily includes the power to enact regulations governing the reasonable use of water.

The Supreme Court has recognized as much, describing the Board's regulatory authority in the broadest terms.  "The Legislature, consistent with its authority under [Article X, Section 2], has established a thorough statutory system insuring reasonable water allocation and safeguarding water purity, commensurate in scope with the

---

[9] Amicus curiae California Farm Bureau Federation deceptively characterizes *California Trout* as declaring "clearly established law" that " 'what is a reasonable or unreasonable use of water is a judicial question to be determine in the first instance by the trial court.' " (*California Trout, supra*, 207 Cal.App.3d at p. 623.)  In fact, *California Trout* rejected that position, finding the plaintiff's contention that "the question of reasonableness invariably must be resolved ad hoc, adjudicatively" to be "unsupported by apposite authority and insupportable in reason and legal doctrine." (*Id.* at p. 624.)  As the quote in the text demonstrates, the holding of *California Trout* was precisely the opposite of the holding ascribed to it by amicus curiae.

constitutional provision. [Citation.] The statutes vest the [Board] with full authority to 'exercise the adjudicatory and regulatory functions of the state in the field of water resources.' [Citations.] It has been granted broad authority to control and condition water use, insuring utilization consistent with public interest. [Citation.] This authority includes protection of the environment. [Citation.] The [Board's] powers extend to regulation of water quality and prevention of waste. [Citations.] *It has adopted administrative regulations to prevent waste and unreasonable use.*" (*EBMUD, supra,* 20 Cal.3d at pp. 341–342, italics added.) While the *EBMUD* decision did not address the validity of the regulations to which it referred, the court did not hesitate in recognizing them as an exercise of the Board's authority. (See similarly *Audubon Society, supra,* 33 Cal.3d at p. 449 ["we have discerned a legislative intent to grant the Water Board a 'broad,' 'open-ended,' 'expansive' authority to undertake comprehensive planning and allocation of water resources"].)

In arguing the Board's authority in this area is limited to enforcement actions, plaintiffs rely in part on the text of section 275, the statutory provision directly addressing unreasonable use, which instructs the Board to "take all appropriate proceedings or actions before executive, legislative, or judicial agencies to prevent waste, unreasonable use, unreasonable method of use, or unreasonable method of diversion of water in this state." Conspicuously missing, plaintiffs contend, is any reference to the exercise of rule-making authority. While we acknowledge the absence, we do not construe section 275 as a limitation on the Board's authority in the area of unreasonable use. As discussed above, the remaining provisions of the Water Code, as construed by decisional authority, vest in the Board broad adjudicatory and regulatory power and suggest the Board's regulatory authority is coincident with that of the Legislature. There is no reason to conclude the Legislature intended the Board to have less or restricted authority in enforcing the constitutional mandate of Article X, Section 2.

A contention similar to plaintiffs' was rejected in *Imperial Irrigation Dist. v. State Water Resources Control Bd.* (1986) 186 Cal.App.3d 1160, in which the Board conducted hearings, found the plaintiff's failure to implement water conservation

18

measures to constitute an unreasonable use of water, and ordered it to undertake various measures. (*Id.* at p. 1163.) On appeal, the plaintiff challenged the Board's authority to adjudicate the issue of reasonable use, contending the Board was required by section 275 to rely on the courts in carrying out its mandate to prevent the unreasonable use of water. After reviewing the various statutes conferring regulatory authority on the Board, the court concluded section 275 was intended to augment the Board's powers, rather than limit them: "No case has construed section 275 as a limitation on the Board's adjudicatory power. . . . [¶] A case decided since the trial court's hearing in this matter correctly cites section 275 when viewed together with [Article X, Section 2] and section 1050, as authority for the proposition the Board has 'the *separate and additional power* to take whatever steps are necessary to prevent unreasonable use or methods of diversion.' [Citation.] . . . Section 275 is not to be construed as a limitation on the Board's adjudicatory authority, but rather as a statute granting separate, additional power to the Board." (*Id.* at pp. 1169–1170.) In the same manner, we conclude section 275 does not limit the Board's authority under section 1058 to issue appropriate regulations.

Particularly in these circumstances, there is a practical reason for recognizing the Board's authority to issue regulations. The problem addressed by Regulation 862 is the abrupt drop in stream levels that occurs when a large number of users simultaneously activate sprinklers that draw a large volume of water. No one doubts the use of sprinkled water to prevent crop frost damage is a beneficial one. Whether it is also a reasonable use, the Board has determined, depends upon whether "the diversion can be managed to avoid the harm" to salmonids. It appears that in many, or perhaps most circumstances, diversion for frost protection purposes from the Russian River stream system is biologically harmless. Yet on those occasions when it might be damaging, it has the potential to inflict long-lasting damage on already fragile salmon populations. Restricting the Board to post-event litigation deprives it of any effective regulatory remedy, since the damage will have been done and the critical circumstances may not arise again for months or years. It is difficult to imagine what effective relief a court could grant, other than a broad and inflexible injunction against future diversion for

19

purposes of frost protection, a ruling that would be in the interests neither of the enjoined growers nor the public.  Efficient regulation of the state's water resources in these circumstances demands that the Board have the authority to enact tailored regulations.[10]

## 2. *Regulation of Riparian Users and Pre-1914 Appropriators*

In contending the Board exceeded its authority, plaintiffs also cite the time-honored exemption of riparian users and pre-1914 appropriators from the permitting authority of the Board.  (E.g., *Farm Bureau, supra*, 51 Cal.4th at p. 429.)  While such users cannot be required to obtain permits as a condition of exercising their right to divert, that does not mean their use of California's waters is free from Board regulation.  "[N]o water rights are inviolable; all water rights are subject to governmental regulation." (*United States, supra*, 182 Cal.App.3d 82, 106.)  The Supreme Court recognized as much in *Farm Bureau*; immediately after noting the Board "has no permitting or licensing authority over riparian . . . rights, or over appropriative rights acquired before 1914," the court observed the Board "does have authority to prevent illegal diversions and to prevent waste or unreasonable use of water, regardless of the basis under which the right is held." (*Id.* at p. 429, fns. omitted.)  That the Board cannot require riparian users and pre-1914 appropriators to obtain a permit before making reasonable beneficial use of water does not mean the Board cannot prevent them from making unreasonable use.  Any other rule would effectively read Article X, Section 2 out of the Constitution.

Plaintiffs argue that Regulation 862 effectively imposes a permit requirement, since it conditions their use of water on compliance with standards developed by a WDMP.  The argument proves too much, since its acceptance would preclude any regulation of water use by riparian users and pre-1914 appropriators.  Preventing these users from the unreasonable use of water necessarily requires the imposition of limits on

---

[10] Our holding is, of course, limited to resolution of the facial challenge presented here:  in general terms, the Board has the authority to find unreasonable a diversion of water for frost protection if that diversion is inconsistent with the public trust by creating a significant risk of salmonid mortality.  Because no WDMP's have been approved, let alone violated, we have no basis for finding any particular failure to comply with a WDMP to be an unreasonable use of water.

that use by the Board.  Limited and particularized prohibitions designed to prevent unreasonable use are different from, and by no means legally equivalent to, the comprehensive regulation embodied in a water use permit, which, as an allocation of "excess water," typically limits the user's rights without regard to the reasonableness of use.  (See *City of Pasadena v. City of Alhambra* (1949) 33 Cal.2d 908, 925–926.)

The Lights contend the "vested rights" doctrine prevents the Board from "redefining" an existing beneficial use as unreasonable.  The position has been rejected repeatedly.  It is now recognized that, since enactment of Article X, Section 2, "there can no longer be any property right in the unreasonable use of water."  (*In re Waters of Long Valley Creek Stream System, supra,* 25 Cal.3d at p. 354.)  What constitutes an unreasonable use of water changes with circumstances, including the passage of time. (*Joslin, supra,* 67 Cal.2d at p. 140; *Tulare Dist. v. Lindsay-Strathmore Dist., supra,* 3 Cal.2d at p. 567 ["What is a beneficial use at one time may, because of changed conditions, become a waste of water at a later time."].)  Thus, the extent of a particular user's vested right to use water similarly may change.  Riparian users' vested water rights extend only to reasonable beneficial water use, which is determined at the time of use.[11]

### 3. *Violation of the Rule of Priority*

The Lights additionally argue that, whatever the scope of the Board's regulatory authority, it does not have the power "to adopt a definition that prohibits a 'beneficial use,' even though the amount of water being used for that beneficial use is no more than minimally required, in order to protect another 'beneficial use' to which it ascribes higher

---

[11] The Lights also argue the Board exceeded its authority because various statutes state they do not grant the Board authority to regulate water use "not otherwise subject to regulation" by the Board.  (E.g., § 1831, subd. (e).)  Because Regulation 862 concerns regulation of the unreasonable use of water, it does not concern a use not otherwise subject to the Board's jurisdiction.  (See Article X, Section 2 ["Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section . . . ."].)  As noted in the text, precisely what type of water use is unreasonable varies with time and circumstance.

21

priority." Essentially on this basis, the parties characterize the Board's regulation as a violation of the rule of priority.

In analyzing this contention, we start with the premise that the supply of water in California is variable and at times insufficient to supply all possible beneficial uses. As the circumstances of this appeal demonstrate, this may be true on a temporary and localized basis, as well as on a more global one. When the supply of water in a particular stream system is insufficient to satisfy all beneficial uses, water rights users must curtail their use. As discussed above, the rule of priority dictates that riparian users are satisfied first, but when the supply runs sufficiently short, even riparian users must curtail their beneficial use proportionately. (*United States, supra*, 182 Cal.App.3d at p. 104.)

So long as the only water uses involved are those governed by common law and statutory water rights, the Lights' contention might have force. When the supply of water is insufficient to satisfy all persons and entities holding water rights, it is ordinarily the function of the rule of priority to determine the degree to which any particular use must be curtailed. Yet even in these circumstances, the Board has the ultimate authority to allocate water in a manner inconsistent with the rule of priority, when doing so is necessary to prevent the unreasonable use of water. (*El Dorado, supra,* 142 Cal.App.4th 937, 966.) Because " 'no one can have a protectible interest in the unreasonable use of water' [citation] . . . when the rule of priority clashes with the rule against unreasonable use of water, the latter must prevail." (*Ibid.*)

This case, moreover, involves more than traditional water rights. As the Supreme Court held in *Audubon Society,* no party can acquire a vested right to appropriate water in a manner harmful to public trust interests and the state has "an affirmative duty" to take the public trust into account in regulating water use by protecting public trust uses whenever feasible. (*Audubon Society, supra,* 33 Cal.3d at pp. 446–447.) Although the *Audubon Society* court considered the public trust doctrine only in relation to permitted appropriative water rights, subsequent decisions have assumed the doctrine applies as well in the context of riparian and pre-1914 appropriator rights. (*United States, supra,* 182 Cal.App.3d at p. 106 [in *Audubon Society,* "the court determined that no one has a

22

vested right to use water in a manner harmful to the state's waters"]; *El Dorado, supra,* 142 Cal.App.4th at p. 966 ["when the public trust doctrine clashes with the rule of priority, the rule of priority must yield"].)

In holding that Regulation 862 does not violate the rule of priority, our decision extends only to the regulation's potential for allocating water between the beneficial public trust use of maintaining stream levels to avoid salmonid deaths and the beneficial use of diversion for frost protection by water rights holders. As between particular rights holders, "[e]very effort . . . must be made to respect and enforce the rule of priority. A solution to a dispute over water rights '*must* preserve water right priorities to the extent those priorities do not lead to unreasonable use.' " (*El Dorado, supra,* 142 Cal.App.4th at p. 966.) The Sacramento plaintiffs argue this principle is violated because "[t]he regulation broadly declares unreasonable all water used for frost protection purposes in two counties, without consideration of the priority of individual's water rights." This badly misstates the import of the regulation. Regulation 862 does not declare any specific diversion of water for frost protection unreasonable, much less all such use. Frost protection diversion is unreasonable only if it occurs in violation of a WDMP. As among individual water rights holders, Regulation 862 requires WDMP's to respect the rule of priority in assigning corrective actions. (*Id.*, subd. (c)(4).)

While it is possible, as the Sacramento plaintiffs argue, that the decentralized system of WDMP's creates a risk of priority rule violations, such concerns are premature until WDMP's have been put into effect. This is a facial challenge to Regulation 862, and we hold only that there is no basis for finding Regulation 862, on its face, violates the rule of priority. A determination of whether specific regulatory measures adopted by the WDMP's violate the rule of priority, and whether any such violation is justified by the Board's responsibilities under Article X, Section 2, must await implementation of the regulation.[12]

---

[12] The Sacramento plaintiffs argue at length the Board should have adopted substantive regulations requiring attenuation of use first by junior appropriators and deferring attenuation by users with priority. While this is certainly one form substantive

**C.** *Delegation of Regulatory Authority to WDMP Governing Bodies*

The trial court concluded Regulation 862 improperly delegated the regulatory authority of the Board to WDMP's, reasoning the requirement of the section that the governing body be "capable of ensuring that the requirements of the program are met" (Regulation 862, subd. (b)) means enforcement of the WDMP's has been delegated to the governing boards. The court also concluded the section constituted an improper delegation of legislative authority because "[d]eclaring the use of water for frost protection an unreasonable use of water is a fundamental shift in water policy in this state." We review the constitutional issue of unlawful delegation de novo. (*People ex rel. Lockyer v. Sun Pacific Farming Co.* (2000) 77 Cal.App.4th 619, 632 (*Sun Pacific*).)

There is a tension when private industry shares responsibility for the governmental regulation of its commercial activities. On the one hand, members of the industry are well positioned to understand the regulatory needs and the impact of regulation on their business activities. In this respect, they are ideal partners in the formulation of appropriate regulations. Perhaps for this reason, it has never been held that the mere involvement of regulated private parties in the making of administrative regulations constitutes an improper delegation of governmental authority. On the other hand, by involving members of the regulated industry the agency runs the risks associated with the fox guarding the henhouse. As a result, there is "a tight line between lawful and unlawful delegation of regulatory authority." (*International Assn. of Plumbing etc. Officials v. California Building Stds. Com.* (1997) 55 Cal.App.4th 245, 253 (*Plumbing etc. Officials*) [holding that model building codes developed by private parties cannot become binding regulations without agency review and approval].)

"To put it simply, the Legislature could not lawfully grant the power to make laws to a private entity." (*Plumbing etc. Officials, supra*, 55 Cal.App.4th at p. 253.) While, as

---

regulation could have taken, the Board's decision to leave such substantive regulation to the WDMP's did not render the regulation in excess of the Board's authority, since the regulation requires priorities to be respected within individual WDMP's when corrective actions are mandated. (Regulation 862, subd. (c)(4).)

illustrated in *Plumbing etc. Officials*, private entities can formulate and suggest potential regulation, the doctrine of unlawful delegation requires the Legislature or a regulatory agency to exercise the final say over whether any particular regulation becomes law. In addition, the Legislature cannot "delegat[e] . . . regulatory power to agencies composed of interested members of the regulated industries without imposing standards or safeguards adequate to prevent abuse. Absent the required safeguards, such grants of authority constitute unconstitutional delegations of legislative power." (*Dunn-Edwards Corp. v. South Coast Air Quality Management Dist.* (1993) 19 Cal.App.4th 536, 545–546, fn. 5; see *Bayside Timber Co. v. Board of Supervisors* (1971) 20 Cal.App.3d 1, 11.)

The delegation of authority to the WDMP governing bodies under Regulation 862 is not materially different from the type of delegation found lawful in *Sun Pacific*. The defendant in *Sun Pacific* was a citrus grower that concededly harbored diseased trees in its operations. When the state brought an action in the name of the local citrus pest control district to remove the diseased trees, the defendant challenged the constitutionality of the delegation of power to the district. (*Sun Pacific, supra*, 77 Cal.App.4th at p. 625.) Citrus pest control districts are established pursuant to state law for more effective control and eradication of disease. They may be organized by the local county boards of supervisors upon the petition of the owners of a majority of citrus growing acreage in a district. The districts are governed by a five-person board of local growers, required to formulate a plan for pest control and eradication, and granted various powers to effectuate the program. (*Id.* at p. 627.) In considering the lawfulness of this broad delegation, the court noted, " '[a]n unconstitutional delegation of authority occurs only when a legislative body (1) leaves the resolution of fundamental policy issues to others or (2) fails to provide adequate direction for the implementation of that policy.' " (*Id.* at p. 633.) In rejecting the argument "self-interested citrus growers" who comprise a district's board unlawfully "set policy," the court held that the Legislature had "made basic policy decisions with respect to the control and eradication of citrus pests, through the best known and accepted methods," leaving only the implementation of that policy to growers. (*Id.* at pp. 633, 634.) In addition, the Legislature included "specific

25

standards and safeguards . . . in the statute for both the formation of the pest control districts and the exercise of their authority" to protect against the districts "exercising their regulatory power arbitrarily." (*Id.* at p. 634.)

Similarly, in formulating Regulation 862, the Board clearly set out the fundamental purposes of the WDMP's: to develop and implement methods for monitoring the level of the affected watercourses, determining when that level poses a threat to young salmon, and responding with "corrective actions" to reduce a threat once detected. (Regulation 862, subds. (b), (c)(2)–(4).) It then established detailed standards for the manner in which the WDMP governing bodies are to monitor stream levels and the type of corrective measures that can be instituted to prevent sudden decreases in water level. (*Ibid.*) Finally, the Board placed itself between the governing bodies and the regulated growers. No program developed by a governing body will become effective— will acquire the force of law—until it has been approved by the Board, and that approval must be sought annually. Nothing more was required to prevent an unlawful delegation of authority.[13]

Unlike the trial court, we do not construe Regulation 862 as delegating enforcement authority to the governing bodies. Read in context, the requirement a governing body be "capable of ensuring that the requirements of the program are met" (Regulation 862, subd. (b)) means only the governing body must have the organization and financial resources sufficient to develop a program, monitor its implementation, and comply with the reporting requirements—in other words, be capable of administering a WDMP. The statute is clear that the failure to comply with a WDMP, once it has been approved, "shall be subject to enforcement by the board," not the WDMP. (Regulation 862, subd. (e).) The enforcement obligation of the WDMP's governing body

---

[13] The trial court was concerned that an improper delegation of authority had occurred because a WDMP could require costly and intrusive regulatory steps of diverters. While it is possible that individual WDMP's will find it necessary to require such corrective actions, their imposition is authorized by the Board in subdivision (c)(4) of Regulation 862. Further, no corrective actions can be imposed except under the terms of a WDMP, which must be approved in advance annually by the Board.

26

is limited to reporting an uncooperative diverter to the Board.  (Regulation 862, subd. (c)(5)(E).)  While it is true, as the Sacramento plaintiffs argue, that the governing bodies will decide which growers must take corrective actions at any given time, those decisions must be made in accordance with the WDMP, which in turn must be approved by the Board.  The role of the governing body is therefore the administration of a Board-approved policy.[14]

The trial court's conclusion that the issue of balancing water use for frost protection against water needs for the protection of wildlife is novel and "fundamental" was erroneous, both conceptually and factually.  The Board first declared the use of water for frost protection to be unreasonable at least as early as *Forni*, decided in 1976.  Moreover, the truly fundamental issue was decided by the Legislature over a half-century ago when it enacted section 1243 and amended section 1257.  The former declares "[t]he use of water for recreation and the preservation and enhancement of fish and wildlife resources is a beneficial use of water" (Stats. 1959, ch. 2048, § 1, p. 4742), while the latter similarly characterizes "preservation and enhancement of fish and wildlife" as a beneficial use (Stats. 1959, ch. 2048, § 2, p. 4742).  These sections represent a Legislative declaration that the welfare of wildlife is a beneficial use on a par with the type of commercial use that has traditionally been recognized as beneficial.  Because, as discussed above, the responsibility of the Board is to regulate the use of water for

---

[14] Amicus curiae Northern California Water Association urges us to invalidate Regulation 862 because the use of multiple, independent WMDP governing bodies composed of self-interested members of the industry to regulate frost protection diversion is a bad idea that will, in very general terms, create more problems than it solves.  They describe an alternative, voluntary approach that has worked well under different circumstances in the Sacramento-San Joaquin Delta.  While amicus curiae's observations about the structure of Regulation 862 might well be accurate, we have no power to second-guess the wisdom of the Board's manner of regulation, at least so long as it is not arbitrary and capricious.  No party to the appeal challenged per se the diversified, self-regulatory structure of Regulation 862 in the briefs.  Counsel for the Sacramento plaintiffs did characterize the structure of Regulation 862 as a "train wreck" at oral argument, but we take the comment to be rhetoric rather than legal argument.

beneficial purposes, balancing the use of water for frost protection against its use for salmon habitat is simply an application of this fundamental policy decision.[15]

The Lights contend section 1243 actually expresses a Legislative preference for "riparian rights over fish," based on the concluding sentence of the statute. Although section 1243 instructs the Board to "take into account, whenever it is in the public interest, the amounts of water required for recreation and the preservation and enhancement of fish and wildlife resources" when "determining the amount of water available for appropriation for other beneficial uses," it ends with the statement, "This section shall not be construed to affect riparian rights."[16] In understanding the Legislature's intent, it is important to recognize the context of section 1243, which is codified in the part of the Water Code dealing with the Board's authority to issue permits and in an article defining beneficial uses, which begins with the declaration that such uses are a prerequisite for the granting of such a permit. (§ 1240.) Given this context, we interpret the final sentence in section 1243 to constitute a reaffirmation of the freedom of riparian users from the permitting authority of the Board, rather than a general declaration that the rights of riparian users are paramount to the preservation of water as wildlife habitat.[17]

---

[15] For the same reason, we reject the Lights' contention that the adoption of Regulation 862 constituted a violation of the separation of powers doctrine because it left to the Board the resolution of a " 'truly fundamental issue.' " (*Bayside Timber Co. v. Board of Supervisors*, *supra*, 20 Cal.App.3d 1, 11.)

[16] Section 1243 now reads in full: "The use of water for recreation and preservation and enhancement of fish and wildlife resources is a beneficial use of water. In determining the amount of water available for appropriation for other beneficial uses, the board shall take into account, whenever it is in the public interest, the amounts of water required for recreation and the preservation and enhancement of fish and wildlife resources. [¶] The board shall notify the Department of Fish and Game of any application for a permit to appropriate water. The Department of Fish and Game shall recommend the amounts of water, if any, required for the preservation and enhancement of fish and wildlife resources and shall report its findings to the board. [¶] This section shall not be construed to affect riparian rights."

[17] Section 1257, which similarly characterizes habitat preservation as a beneficial water use, contains no language regarding riparian uses.

28

The Lights also argue that allowing the WDMP's to develop their own regulations constitutes an unlawful delegation of the Board's responsibilities under *Schecter v. County of Los Angeles* (1968) 258 Cal.App.2d 391 (*Schecter*). *Schecter* involved a dispute between the county's civil service commission and its board of supervisors over job classifications in the sheriff's department. Pursuant to a commission rule requiring its chief staff member to develop job classifications, subject to the approval of the commission, the chief recommended to the commission the consolidation of certain sheriff's department job classifications. The commission rejected the chief's recommendation, instead adopting its own, different classifications. When the commission's order was sent to the board of supervisors for adoption, the board refused, in effect arguing the commission's rule permitted it only to accept or reject the chief's recommendation, rather than to develop classifications on its own initiative. (*Id.* at pp. 393–396.) The court rejected the board's position, finding the board's interpretation of the regulation to constitute an improper delegation of the commission's authority to its staff member. While the commission could rely on employees to " 'investigate and report the facts and their recommendation' " and to draft orders in the first instance, the court held, the members of the commission were required to exercise their own discretion in approving a final order. (*Id.* at pp. 396–397.) Accordingly, the court affirmed the trial court's order requiring the board to adopt the commission's classifications.

As is evident from this description, *Schecter* does not suggest that an unlawful delegation occurred here. In the same way that the civil service commission could use its employees to investigate and draft a proposed classification order, the Board can rely on WDMP's to organize and draft programs. So long as the Board exercises its independent discretion in evaluating those programs, no unlawful delegation has occurred. The requirement of Regulation 862 that the Board approve any program implicitly requires just such an exercise of independent discretion.[18]

---

[18] The Lights also contend *Schecter* stands for the principle that "power [that] is delegated by the people to the Legislature [in Article X, Section 2] . . . cannot be re-delegated by the Legislature to the Board." *Schecter*, which addressed an issue of local

29

**D. *The Necessity for Regulation 862***

The trial court also found no substantial evidence to support the Board's finding of regulatory necessity for Regulation 862, concluding the Board had not collected sufficient data to demonstrate the need for the regulation, particularly in light of the purported success of voluntary efforts at mitigating the problem.

Government Code section 11350, the statute governing judicial review of administrative regulations, states a regulation "may" be declared invalid if "[t]he agency's determination that the regulation is reasonably necessary to effectuate the purpose of the statute, court decision, or other provision of law that is being implemented, interpreted, or made specific by the regulation is not supported by substantial evidence." (*Id*., subd. (b)(1); see also Gov. Code, § 11342.2 [regulation valid only if it is "reasonably necessary to effectuate the purpose" of the statute it implements].) " '[Q]uasi-legislative rules . . . represent[] an authentic form of substantive lawmaking: Within its jurisdiction, the agency has been delegated the Legislature's lawmaking power. [Citations.] . . . When a court assesses the validity of such rules, the scope of its review is narrow. . . .' [Citations.] When a regulation is challenged on the ground that it is not 'reasonably necessary to effectuate the purpose of the statute,' our inquiry is confined to whether the rule is arbitrary, capricious, or without rational basis [citation] and whether substantial evidence supports the agency's determination that the rule is reasonably necessary [citation]." (*Western States Petroleum Assn. v. Board of Equalization* (2013) 57 Cal.4th 401, 415.) "In determining whether [an agency's decision] was supported by substantial evidence, we resolve all conflicts in favor of the [agency], indulging in all legitimate and reasonable inferences from the record. . . . When two or more inferences can be reasonably deduced from those facts, the reviewing court

---

law, did not involve any delegation of constitutionally derived authority, nor did it use the term "re-delegation." We are not aware of any general legal prohibition on the Legislature's delegation of duties granted under the state Constitution to administrative agencies. On the contrary, because the Legislature does not engage in the administration of the state's laws once enacted, it has little choice but to "re-delegate" such duties.

has no power to substitute its deductions for those of the fact finder." (*Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 374.) " '[R]easonable necessity . . . generally does implicate the agency's expertise; therefore it receives a much more deferential standard of review.' " (*California Assn. of Medical Products Suppliers v. Maxwell-Jolly* (2011) 199 Cal.App.4th 286, 315.) In reviewing a finding of reasonable necessity, our task "is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review . . . is de novo." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427.)

Regulation 862 was enacted to protect salmonids in the Russian River stream system from stranding mortality due to sudden drops in water level during the late spring and early summer. The Fisheries Service concluded salmonids' propensity to occupy shallow water at the margins of the stream and their immature swimming skills make them vulnerable to sudden drops in water level, and, as noted, strandings were found following a period of abrupt fluctuations in stream flow in 2008. The Board's conclusion the sudden drops in stream flow were caused by the unregulated diversion of water for the purpose of frost protection was based on studies finding that the drops were associated with predicted sub-freezing air temperatures, had been increasing in recent years, and did not occur in areas without vineyards. It is a logical inference from these observations that growers' frost protection diversion was the cause of the sudden drops. The Board's conclusions were further supported by a study prepared by the Fisheries Service, which surveyed a wide range of scientific literature and concluded, "the threat of frost protection on salmonids is significant and widespread throughout the Russian River watershed." (Nat. Marine Fisheries Service, Frost Protection Threat Assessment for Threatened and Endangered Salmonids in the Russian River Watershed (Draft, Nov. 10, 2009) p. 2.) In fact, one of the April 2008 strandings was traced directly to a single event of water diversion for frost protection by a particular grower at Felta Creek. Giving due deference to the Board's expertise, and recognizing our obligation to resolve conflicts and draw inferences in the Board's favor, we conclude the foregoing provides substantial

31

evidence to support the Board's conclusion that some regulation of growers' diversion of water for frost protection was necessary to prevent unwarranted salmonid mortality.

The Sacramento plaintiffs fault the four scientific studies reproduced in the record, arguing none of them directly connects salmonid strandings with water diversion for frost protection. The Lights criticize the work of the Fisheries Service in investigating the stranding problem and argue the actual mechanism of salmonid stranding is not well understood. It appears to be unknown, for example, whether stranding occurs because the "stage," or height, of the water drops below a certain level, or because the drop in stage occurs too quickly, or from an interaction of the two factors—for example, a rapid drop from an already low stage. It appears similarly unknown how such a drop in stage is correlated with the volume of water flowing in the watercourse, which is the actual measurement normally made in monitoring stream flow.

While we acknowledge the validity of some of plaintiffs' observations about the shortcomings of the current level of scientific knowledge, they do not lead to the conclusion the Board's finding of necessity was not supported by substantial evidence. As to the Sacramento plaintiffs' criticisms, the four studies discussed were not the only scientific evidence in the record. The Fisheries Service study mentioned above summarized the findings of a number of studies of hydrology and salmon biology, explaining the mechanism of salmonid stranding and supporting the Board's reasoning with respect to the impact of frost protection diversion. The Lights' observations about the precise mechanism of stranding highlight the uncertainty about the type of corrective actions necessary and when they should be employed, but they do not suggest the Board's conclusions about the need for *some* type of regulation are unsupported. Given the evidence discussed above, the Board's inference associating salmonid mortality with the dramatic and sudden declines observed during periods of low temperature is a reasonable one, as is the inference connecting those declines with diversion for the purpose of frost protection. Our standard of review requires us to draw all reasonable inferences in the Board's favor. (*Associated Builders & Contractors, Inc. v. San Francisco Airports Com., supra,* 21 Cal.4th at p. 374.) While it may be uncertain from

32

the record precisely what type of regulation of frost protection diversion is necessary to protect salmonids, the need for some type of regulation is supported by substantial evidence.[19]

The Lights contend the Board's evidence was "concocted," citing an attorney letter submitted to the Board on behalf of a winery. The letter provides no evidence, or even argument, to refute the genuine nature of the strandings found by the Fisheries Service. Instead, it argues (1) voluntary efforts by growers combined with better coordination of water releases by the SCWA make future similar strandings less likely; (2) the combination of low flow and frost threat that led to the 2008 incident was relatively rare, having occurred in only 5 of the last 19 years; (3) and the actual cause of the strandings was the failure of the SCWA in April 2008 to meet its "instream flow requirements."

None of these arguments demonstrate the finding of necessity for the Board's regulation was not supported by substantial evidence. As the trial court recognized, it was within the Board's discretion to disregard the effects of voluntary efforts to mitigate the problem, since these efforts could be reversed or abandoned in the absence of compulsory regulation.[20] In any event, the evidence that voluntary efforts had mitigated

[19] The Sacramento plaintiffs also argue the regulation is overbroad because it "declares unreasonable hundreds of frost protection diversions" without sufficient evidence. In fact, Regulation 862 does not declare unreasonable any particular frost protection diversion and appears designed to produce WDMP's that would restrict frost protection diversion only when a particular combination of hydrology and weather conditions suggests a threat to salmonids.

[20] As the draft environmental impact report prepared in connection with Regulation 862 noted in finding voluntary programs inadequate, "Review of local voluntary efforts shows that the scope of the frost protection threat is beyond the ability of local organizations to manage on a strictly voluntary basis. The voluntary programs submitted for review did not have adequate plans for conservation in tributary streams, including monitoring programs. Conservation and monitoring in tributaries is important since these are locations where the impacts of water diversion for frost protection are likely most acute, and where the majority of the salmonid habitat is located. In addition the voluntary programs do not possess the authority or willingness to ensure full compliance with proposed activities."

33

the problem in the areas immediately surrounding the documented strandings, cited in the letter, did not support a finding of successful mitigation elsewhere on the stream system. As to the release of more water by the SCWA, the Board was entitled to rely on the SCWA's own conclusion that additional releases of water alone could not cure the problem, both because of the difficulty of accurately predicting the need for such releases and because the problem is one of sudden drops caused by uncoordinated diversion, rather than a more general lack of sufficient water in the system. Finally, as to the rarity of the causative conditions, this will presumably be taken into account in the WDMP's. Given the potential impact on endangered and threatened salmon populations by these incidents, their rarity would be an argument for regulation responsive to environmental conditions, as Regulation 862 requires, not for an absence of regulation altogether.

## E. *CEQA*

The Board prepared an initial draft environmental impact report in May 2011 and issued a revised draft environmental impact report (EIR) four months later. The trial court found the EIR inadequate because (1) it failed to assess the impact on strandings of diversions other than for frost protection purposes, (2) it contained no determination of the flow levels necessary to protect salmonids, (3) it failed to adopt reasonable mitigation measures, and (4) it failed to identify and analyze other environmental impacts.

" 'Section 21168.5 [of the Public Resources Code] provides that a court's inquiry in an action to set aside an agency's decision under CEQA "shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." As a result of this standard, "The court does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document." [Citation.]' [Citation.] 'We may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable.' [Citation.] [¶] 'An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the

agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo.' " (*In re Bay-Delta etc., supra,* 43 Cal.4th 1143, 1161–1162.)

### 1. *Failure to Consider Other Diversions*

As discussed above, the flow in the Russian River stream system is determined in part by water releases from two large dams. In addition, as the EIR noted, water is diverted from the system for a number of purposes other than frost protection; less than one-third of the persons and entities having water rights in the system use those rights for purposes of frost protection. The trial courted faulted the EIR for failing to quantify these other diversions, including the amount of water impounded by the dams during the relevant March to May period, concluding it was "essential . . . to comprehend how in-stream flows levels [*sic*] are being impacted during the frost season." The Sacramento plaintiffs contend, and the trial court found, the EIR was deficient because it failed to consider the impact on salmonid strandings by these various other diversions.

The EIR explained its failure to address other sources of diversion in its response to comments. Replying to a comment that "diversion by the urban contractors and the [SCWA] must be considered," the Board explained, "municipal diversions along the mainstem Russian River are not included in the proposed regulation because these diversions are made at a rate that is known and accounted for by [SCWA's] releases to maintain flows." (Div. of Water Rights, State Water Resources Control Bd., Responses to Public Comments on the May 2011 Draft Russian River Frost Protection Regulation (Sept. 2011) p. 77.) In response to another comment, the Board explained that diversion for irrigation was not considered because irrigation use was "self randomizing and of relatively low intensity. Frost protection is essentially the opposite. During major frost events, almost everyone is forced to protect all of their crops simultaneously using high-volume overheard sprinkler systems . . . . This acute demand can cause large, short term fluctuations in flow." (*Id.* at p. 83.)

In essence, the Board declined to quantify and otherwise consider in more detail other types of diversion because, it believed, they did not affect the problem of salmonid stranding. As discussed at length above, the Board concluded stranding is caused by

35

sudden drops in stream level associated with simultaneous, large-scale diversion for the purpose of frost protection. Conversely, the Board reasoned, because the other sources of diversion occur at a relatively steady and predictable pace that is compensated for by the dam releases, they have no impact on stranding. Since, as discussed above, the Board's view is supported by substantial evidence, we find no abuse of discretion in the failure of the EIR to consider this issue. Plaintiffs may disagree with the Board about the cause of the strandings, but the Board was not required to adopt their views in compiling the EIR.

We also find no abuse of discretion in the EIR's failure to quantify the amount of water retained by the dams. Given their importance in regulating flow on the stream system and the legal constraints governing their release of water, the operation of the dams is, in effect, part of the environmental baseline. The EIR described their role in its "Background" section: "[SCWA] operates Lake Mendocino and Lake Sonoma for water supply purposes in accordance with State Water Board Decision 1610, which set instream flow requirements for the mainstem Russian River below Lake Mendocino and for Dry Creek below Lake Sonoma." Because SCWA is legally constrained in maintaining instream flow by the terms of the Board decision, the amount of water retained is irrelevant to a discussion of the environmental impact of Regulation 862.[21]

The trial court also faulted the EIR for not considering larger releases from the dams in anticipation of predicted frost in its alternatives section. As the Board noted in response to a comment, "due to the location and operational limitations of the dams, releases from [the dams] simply cannot independently mitigate for the rapid increase in demand for water for frost protection." In other words, the alternative suggested by the trial court would not address the problem targeted by the regulation. "[A] lead agency may structure its EIR alternative analysis around a reasonable definition of underlying

---

[21] To the extent plaintiffs fault the Board for failing to consider increasing the instream flow as a cure for salmonid stranding, we agree with the Board that plaintiffs are improperly attempting to dictate the nature of the project. It was within the Board's discretion to elect to prevent harm to salmonids by regulating frost protection diversion rather than opening the sluice gates.

purpose and need not study alternatives that cannot achieve that basic goal." (*In re Bay-Delta etc., supra*, 43 Cal.4th at p. 1166.)  Because anticipatory releases would not have solved the problem, the EIR was not required to consider such releases as an alternative.

### 2. *Minimum Flow Levels*

The trial court concluded the discussion of environmental impacts was inadequate because the Board had not determined the minimum stream flow necessary to prevent strandings.  Without knowing the minimum level of stream flow that must be maintained, the court concluded, the Board could not determine the extent to which growers would be required to alter their frost protection conduct and therefore could not determine the full environmental impact of the regulation, to the extent environmental impacts were associated with the various corrective actions.

The Sacramento plaintiffs make essentially the same argument in contending the EIR was deficient because it "fails to disclose the conditions necessary to protect salmonids."  They argue the EIR failed to establish the streamflow conditions sufficient to protect the salmonids, to correlate the amount of water diverted with streamflow reduction rates, and to use this information to determine the type and amount of diversions necessary.  Like the trial court, they argue the environmental impacts of the regulation cannot be understood until these determinations are made.

Rather than setting a particular flow level, Regulation 862 anticipates that each WDMP will include a "determination of the stream stage that should be maintained at each [g]age to prevent stranding mortality." (Regulation 862, subd. (c)(2)(B).)  As all parties appear to agree, the hydrology of the Russian River stream system and its impact on salmonid mortality is insufficiently understood to determine what stream level must be maintained to prevent mortality, or even whether a particular level is necessary.  As discussed above, the assumption underlying the Board's analysis is that sudden declines in flow, rather than low flow per se, are responsible for the strandings.

While the Board was unable to determine with specificity the effect of the regulation on grower conduct, the EIR did not ignore the issue of the environmental impact of proposed corrective actions.  Section 6.1.2 of the EIR calculated a range of the

agricultural acreage that might be required to adopt corrective measures. Subsequent sections then evaluated the environmental impact of the adoption of such corrective actions as increased groundwater extraction (Section 6.2), expansion of offstream storage (Section 6.3), removal of surface water diversion structures (Section 6.4), installation of wind machines (Section 6.5), installation of heaters (Section 6.6), and installation of stream stage gauges (Section 6.7), as well as "Other Potential Actions That May Be Taken by Affected Persons That Are Not Anticipated to Result in Significant Impacts to the Environment" (Section 6.8). The problem identified by the trial court is not that the EIR disregarded the environmental impacts associated with corrective actions, but that the EIR was hampered in estimating the cumulative effect of these individual impacts because it could not determine to what degree corrective actions would be necessary. In effect, the trial court held that an adequate EIR could not be prepared until considerably more study had been done.

The trial court's ruling required a legally unnecessary level of precision from the Board. " 'In determining the adequacy of an EIR, the CEQA Guidelines look to whether the report provides decision makers with sufficient analysis to intelligently consider the environmental consequences of a project. [Citation.] . . . ". . . The courts have [therefore] looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." [Citation.]' [Citation.] The overriding issue on review is thus 'whether the [lead agency] reasonably and in good faith discussed [a project] in detail sufficient [to enable] the public [to] discern from the [EIR] the "analytic route the . . . agency traveled from evidence to action." ' " (*California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 262.) As stated in California Code of Regulations, title 14, section 15204 (CEQA Guideline 15204), "the adequacy of an EIR is determined in terms of what is reasonably feasible, in light of factors such as the magnitude of the project at issue, the severity of its likely environmental impacts, and the geographic scope of the project. CEQA does not require a lead agency to conduct every test or perform all research, study, and experimentation recommended or demanded by

38

commentors . . . . as long as a good faith effort at full disclosure is made in the EIR." (CEQA Guideline 15204, subd. (a).)

The Board's discussion of the environmental impacts of the regulation satisfied the requirement of a good faith effort evaluation, based on reasonably available information. The Board estimated the number of acres that would be affected by the regulation and described the environmental impacts associated with the various changes that might be associated with implementation of the regulation. The objective was sufficient analysis to permit an intelligent evaluation of environmental consequences. As CEQA Guideline 15204 notes, an important factor in this equation is the severity of the identified environmental impacts, since greater environmental impact will require a more extensive discussion. The environmental impacts of the corrective actions, as disclosed in the EIR, are limited. Even if it were possible to provide the greater precision demanded by the trial court, that precision is unlikely to have materially changed the magnitude of the likely environmental consequences.

Moreover, it is an open question whether the information sought by the trial court and the Sacramento plaintiffs, the stream flow conditions necessary to prevent harm to the salmonids, would lead to a materially more precise estimate of the environmental impacts, given the wide variety of stream types, acreages, and corrective actions available. Even if the Board had been able to specify with more accuracy the conditions under which corrective action is necessary, those conditions vary widely over the entirety of the stream system. For this reason, it would remain difficult to determine the number and identity of growers required to adopt corrective actions. Further, even if those growers could be identified in some manner, it would be impossible to determine which of the several alternative corrective actions they would adopt, and therefore to estimate the environmental impacts with greater precision. The trial court and the Sacramento plaintiffs are seeking a level of precision that is, as a practical matter, unavailable and is unnecessary for a good faith and reasonable consideration of the environmental impact of the regulation.

The Sacramento plaintiffs contend the lack of such information will result in a large number of environmental impact reports from individual WDMP's, resulting in potentially conflicting estimates of environmental impact. We decline to speculate about the necessity for additional environmental impact reports and hold only that, given the reasonably available information, the Board's EIR adequately considered the environmental impact of the regulation.

### 3. *Reasonable Mitigation Measures*

The trial court's ruling that the EIR failed adopt adequate mitigation measures was linked to its ruling that the EIR was deficient for failing to specify a minimum stream flow. As the court explained, in the absence of that number, "the expected reaction or adjustments to frost protection practices cannot be reliably predicted. The mitigation measures necessary to the concomitant environmental impacts resulting from those adjustments that are predicted in the EIR is unforeseeable and therefore inadequately specified or addressed in the EIR."

The mitigation section of the EIR, Section 7.2, separately considered each of the corrective actions discussed in the impacts section, such as increased groundwater extraction, construction of new water storage facilities, and use of alternative frost protection means, and adopted a series of measures to mitigate the environmental consequences found for each corrective action. In other words, it required the corrective actions to be implemented in an environmentally sensitive manner.

"If it is feasible to do so, a public agency must mitigate or avoid the significant environmental effects of a project that it carries out or approves." (*South County Citizens for Smart Growth v. County of Nevada* (2013) 221 Cal.App.4th 316, 336.) " ' " ' CEQA does not require analysis of every *imaginable* alternative or mitigation measure; its concern is with *feasible* means of reducing environmental effects.' " ' [Citation.] ' "Feasible" means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors.' [Citation.] Mitigation measures that cannot be legally imposed or

enforced need not be proposed or analyzed." (*San Diego Citizenry Group v. County of San Diego* (2013) 219 Cal.App.4th 1, 16.)

The trial court did not conclude the measures proposed by the Board for the corrective actions would not result in the mitigation of the significant environmental impacts caused by implementation of Regulation 862, nor did it conclude there were additional feasible mitigation measures that were not considered by the Board. Instead, the court found the discussion of mitigation measures inadequate because the Board could not predict what mitigation measures would be necessary until the minimum stream flow was specified. This confused two separate concepts: the corrective actions necessary to prevent salmonid mortality and the mitigation measures necessary to minimize the environmental impact from those mitigation measures. While it might not be possible to specify what particular corrective actions must be adopted until the factors affecting stranding are better understood, the same is not true of the mitigation measures necessary to minimize the environmental impact of those corrective actions. Because the environmental impacts of the corrective actions are understood, the Board was able to specify and adopt appropriate measures to minimize those impacts. When and if it is necessary to implement any particular corrective actions, the mitigation measures will ensure implementation is done in an environmentally sensitive manner. This is all the Board was required to do to satisfy its obligation under CEQA to adopt feasible mitigation measures.

### 4. *Other Environmental Impacts*

The trial court found the EIR's discussion of environmental impacts inadequate because it did not include a discussion of the impacts caused by growers abandoning agriculture due to the costs associated with compliance with Regulation 862. The EIR discussed this possibility: "Land conversion was not considered a feasible method of compliance. The proposed regulation does not restrict operations or financially impact the vineyard or orchard owner at a significant enough level to assume that an owner would forfeit the agriculture business and explore other land use alternatives. The proposed regulation . . . . allows for a business to comply with the regulation at the least

41

cost, therefore it is highly unlikely that land conversion would occur." The trial court rejected this conclusion as "unsupported," criticizing the Board's cost estimates and citing comments by growers who anticipated a substantial impact on their operations.

Contrary to the trial court's finding, the EIR's conclusion was not unsupported. In reaching this conclusion, the Board relied on a 46-page study entitled, "Economic Impacts of the Proposed Russian River Frost Regulation."[22] (Office of Research, Planning & Performance, State Water Resources Control Bd., Economic Impacts of the Proposed Russian River Frost Regulation (May 2, 2011).) One section of the study contained an estimate of the vineyard and pear orchard acreage that would be taken out of production as a result of the implementation of Regulation 862. The study concluded that in the two affected counties, 159 of a total of 21,198 acres of vineyard and orchard land, or less than 1 percent, would be taken out of production. The study constitutes substantial evidence to support the Board's conclusion that the environmental impact of farmland conversion will be insignificant. The trial court was not permitted to disregard this evidence merely because commenters disagreed with its conclusions. (*North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 626.)

The Sacramento plaintiffs argue, in addition, the EIR failed to consider the impact on "non-salmonid 'special status' species," which are other plant and animal species threatened or potentially threatened. An appendix to the EIR identified some 22 special status plants and 26 special status animals native to riparian habitats in California.[23]

---

[22] This study was not cited by the Board in its discussion of the issue below and might not have been readily available to the trial court. In the appellate record, the study is found on a CD containing administrative record documents supplementing those submitted in hard copy to the trial court.

[23] Contrary to the Sacramento plaintiffs' characterization, this appendix does not list special status species "that may be impacted" by Regulation 862. While all the listed species are apparently found in California riparian habitats, the appendix does not even identify which are actually found in the Russian River stream system, let alone which, if any, are potentially affected by implementation of the regulation.

Contrary to plaintiffs' claims, the EIR did discuss the impact of the regulation on some special status species. Section 4.7 of the EIR, describing the "environmental setting," notes in general terms the existence of such species in the Russian River stream system, without identifying particular plants or animals present. In the discussion of environmental impacts, the EIR referred several times to the potential for disturbance of special status species and their habitats. In discussing the removal of existing diversion structures, the EIR noted it "would reduce the available habitat used by special-status species such as the western pond turtle and red-legged frog." While the discussion of other species is by no means detailed, the EIR notes the potential for adverse impacts on special status species when appropriate. In the absence of evidence the EIR ignored specific known risks to such species, the discussion is adequate.

### 5. *Other CEQA Arguments*

In addition to seconding the conclusions of the trial court, the Lights raise a series of additional CEQA issues either not considered or rejected by the court.

The Lights first contend the Board's adoption of the resolution certifying the EIR violated Public Resources Code Article X, Section 21082.1, subdivision (c), which requires a lead agency to "[i]ndependently review and analyze any report or declaration required by this division," and California Code of Regulations, title 14, section 15090, subdivision (a), which requires the agency to certify the EIR "[p]rior to approving a project." The claim is based entirely on a Board member's inadvertent reference, in moving adoption of the resolution certifying the EIR and adopting the regulation, to the "regulation" rather than the "resolution."

The Board considered adoption of Regulation 862 at a meeting on September 20, 2011. At the commencement of the meeting, the Board chairperson described the purpose of the meeting as consideration of both the proposed regulation and the associated EIR. An initial presentation by staff reviewed the process by which Regulation 862 was developed, including preparation of the EIR. Following extended public comment, the Board adjourned to allow the staff "to confer about any comments they heard today, CEQA-related comments they may need to respond to on the record."

43

When the Board reconvened, the members questioned staff about various aspects of the proposed regulation, including aspects of the CEQA process and the EIR. At the conclusion of the meeting, a Board member moved adoption of the "regulation," rather than adoption of the resolution that adopted the regulation and certified the EIR. The motion passed unopposed, and the Board adjourned. Promptly thereafter, while all members of the Board were still present, the Board's counsel clarified that the motion was for adoption of the "resolution." The chair responded, "Yes, yes," while at least one member nodded her head in assent.

We find no merit in any argument based on the Board member's slip-of-the-tongue reference to the "regulation" rather than the "resolution." Adoption of a resolution is the procedural vehicle for the adoption of a regulation. The mistaken reference to adoption of the "regulation," as opposed to the "resolution," was understandable. Because the matter on the agenda was presumably the adoption of the resolution, there was no ambiguity in the Board's action, and any uncertainty was cured by counsel's clarification. We also find no basis for the claim of a violation of Public Resources Code section 21082.1, since the record of the meeting plainly reflects the Board's conscious consideration of the EIR. The Lights offer a number of legal theories justifying their presentation of this marginal argument, but they cite no case law holding that a slip of the tongue constitutes a prejudicial procedural error.

The Lights also argue that Regulation 862 was inappropriate for treatment as a program environmental impact report under California Code of Regulations, title 14, section 15168, since a program environmental impact report is intended to "control a series of future activities," whereas Regulation 862 imposed an "immediate and pervasive" ban on frost protection diversion not undertaken pursuant to a WDMP. Contrary to the Lights' claim, the Board made clear its intent not to enforce the ban in Regulation 862 on unregulated diversion until after a period for investigation and adoption of WDMP's, during which project environmental impact reports can be prepared, if necessary. The regulation itself does not require growers to cease diversion until a WDMP has been formulated and approved (Cal. Code Regs., tit. 14, § 15168,

44

subd. (c)(4)), and the resolution adopting the regulation states compliance will not be enforced until at least two years after the regulation becomes effective. We find no abuse of discretion in the Board's decision to proceed by way of a program environmental impact report.[24]

Finally, the Lights contend the Board's findings were inadequate because they did not explain why alternative methods of frost protection were less harmful to the environment than direct diversions. In fact, the Board noted the possible impacts of the alternative methods of frost protection, stated they could be subject to a future project-level environmental impact report if undertaken on a significant scale, and found that, taking the effects of these alternative methods into account, "the economic, social, and environmental benefits of the regulation outweigh any unavoidable adverse environmental effects." This was sufficient under Public Resources Code section 21081, subdivision (b). (See, e.g., *The Flanders Foundation v. City of Carmel-by-the-Sea* (2012) 202 Cal.App.4th 603, 624.)

## III. DISPOSITION

The orders granting a preliminary injunction and the judgment granting a writ of mandate are reversed, and the preliminary injunction is dissolved.

_____
Margulies, Acting P.J.

We concur:
_____
Dondero, J.


_____
Banke, J.

_____

[24] We note that our holding is based in part on the Board's declaration of intent not to enforce Regulation 862 during the initial stages of its implementation. Any change in the Board's position following remand would call into question the validity of our reasoning.

Trial Court:   Mendocino County Superior Court

Trial Judge:   Hon. Ann Moorman

Counsel:

Kamala D. Harris, Attorney General, Robert W. Byrne, Gavin G. McCabe, Assistant Attorneys General, Russell G. Hildreth and William Jenkins, Deputy Attorneys General, for Defendant and Appellant.

Carter, Momsen & Knight, Jared G. Carter and Matisse M. Knight for Plaintiffs and Respondents Rudolph H. and Linda Light.

Somach Simmons & Dunn, Nicholas A. Jacobs and Richard S. Deitchman for Plaintiffs and Respondents Russian River Water Users for the Environment, Allan Nelson, Billy Munselle, Robert Terry Rosetti and Redwood Ranch and Vineyards.

Nancy N. McDonough and Jack L. Rice for California Farm Bureau Federation as Amicus Curiae on behalf of Plaintiffs and Respondents Rudolph H. Light, Linda Light, Russian River Water Users for the Environment, Allan Nelson, Billy Munselle, Robert Terry Rosetti and Redwood Ranch and Vineyards.

Downey Brand, Kevin M. O'Brien and Andrew S. Deeringer for Northern California Water Association as Amicus Curiae on behalf of Plaintiffs and Respondents Russian River Water Users for the Environment, Allan Nelson, Billy Munselle, Robert Terry Rosetti and Redwood Ranch and Vineyards.